628 S.E.2d 284

**CEDAR COVE HOMEOWNERS ASSOCIATION, INC., Respondent,**

v.

**Rudy DiPIETRO and Margaret L. DiPietro, Appellants.**

No. 4092.

Court of Appeals of South Carolina.

Heard Feb. 6, 2006.

Decided March 13, 2006.

Rehearing Denied April 20, 2006.

Rolf Mouin Baghdady, of Chapin, for Appellants.

Spencer Andrew Syrett, of Columbia, for Respondent.

KITTREDGE, J.:

This appeal concerns the construction of restrictive covenants. Rudy and Margaret DiPietro are residents of the Cedar Cove subdivision in Richland County, South Carolina. The Cedar Cove Homeowners' Association (the Association) sought and obtained an injunction requiring the DiPietros to remove a brick patio that encroached approximately three feet onto the common area of the subdivision. The DiPietros appeal, and we reverse. We find the Declaration of Covenants governing the Cedar Cove Subdivision and a balancing of the equities preclude the issuance of the injunction.

## *FACTS / PROCEDURAL HISTORY*

Margaret and Rudy DiPietro have been residents in Cedar Cove since 1998. The subdivision is managed by the Association, which operates pursuant to by-laws. The property of Cedar Cove is subject to restrictive covenants, known as the "Declaration of Covenants, Conditions, and Restrictions for Cedar Cove Subdivision."

A previous owner of the DiPietro lot built a wooden deck behind the house, part of which encroached onto the common area. The Association has never challenged the wooden deck and its encroachment onto the common area. In 2001, the DiPietros desired to construct a patio underneath the deck, primarily because the area under the deck was "unsightly, and there was some soil erosion...." Like the wooden deck, the patio would slightly encroach onto the common area. Rudy DiPietro pursued the desired patio by following the then longstanding informal approach to such matters in Cedar Cove, for strict compliance with the procedural requirements in the restrictive covenants was largely ignored.[1] Rudy prepared a sketch of the proposed patio and presented it to Clark

---

1. For example, Terry Frownfelter, a longtime Cedar Cove resident, acknowledged that many of the residents "that have lived there over the fourteen years that I've been there basically have been able to do what they want to. I'm thirty feet into the common area myself."

Cowsert, a member of the Architectural Review Committee at the time.

Cowsert met with Rudy, reviewed the sketch, and even assisted with "pull[ing] a string across" the ground to determine the precise location and parameters of the patio. Cowsert recommended approval of the patio request to Mike Reed, then president of the Association's Board of Directors. According to Cowsert, "I gave it to Mr. Reed who was president of the Board[ ] and everything went according to what my recommendation was." Reed also inspected the site, and the record establishes that Reed approved of the patio. Even the Association concedes that "there was some level of approval by Mike Reed." Rudy then proceeded with construction of the patio.

In 2002, new officers were elected, and the days of lax governance were over. As the Association's new president, Doug Harder, said, "We try to run the Association like a business." The DiPietros were perhaps the first to experience the "business" approach. On April 8, 2002, Harder and Charles Zinco, chairman of the Architectural Review Committee, delivered a letter to Rudy, directing Rudy to "stop construction." As of April 8, 2002, the patio was substantially completed.[2] Rudy was angered by the Association's tactics and so informed Harder and Zinco with a "few choice words." When Zinco was asked whether it was his "impression that [Rudy] intended to complete the project without further consultation with you all," he responded, "Oh, yes. Yes, sir." Harder expressed similar sentiments, stating that Rudy "did make it known to us" that he was not going to stop construction. As expected, Rudy proceeded to complete the patio.

The Association delayed in taking action, perhaps because the new officers knew Reed, the former board president, gave "some level of approval" to the DiPietros' patio project. According to Harder, there were a number of reasons for the board's prolonged inaction:

---

**2.** The Association's final brief refers to the patio as "80% completed when [Rudy] received the [April 8] letter from the Board." The Association characterizes the 80% figure as a concession by the DiPietros. (Respondent's final brief, 6).

First of all, we are a volunteer board, and we have lives to live and families to raise, and all three of us, as I recall were traveling a great deal during that spring and summertime. I suppose in trying to—we were trying to come up with some way that maybe we could convince Rudy to voluntarily stop, but I guess the summer got away from us enjoying our time on the lake. So it was no conscious decisioin [sic] about, you know, delaying for any reason. We had no attorney for the association at the time. We had to begin, you know, a search for one. That took some time.

The Association filed its Complaint on January 15, 2003. By then, the patio was completed. The Complaint alleges a trespass on the basis that the patio encroaches on the common areas, in violation of Articles V and VI of the restrictive covenants. The claim for damages was withdrawn at trial, and the Association sought a mandatory injunction "directing [the DiPietros] to remove that portion of the brick patio that encroaches and trespasses onto the common areas owned by [the Association]." The master granted the injunction on the basis that the DiPietros failed to "secure the approval" of the Association in accordance with the restrictive covenants. The DiPietros appealed following an unsuccessful motion to reconsider.

## STANDARD OF REVIEW

While a trespass action is one at law, the Association withdrew its claim for damages and sought only an injunction. The character of an action as legal or equitable depends on the relief sought. *Compare O'Shea v. Lesser,* 308 S.C. 10, 14, 416 S.E.2d 629, 631 (1992) (holding an action for breach of restrictive covenants was at law, because relief sought was general damages for loss of view and invasion of privacy) *and Kneale v. Bonds,* 317 S.C. 262, 265, 452 S.E.2d 840, 841 (Ct.App.1994) ("An action to enforce restrictive covenants by injunction is in equity."); *see also S.C. Dep't of Natural Res. v. Town of McClellanville,* 345 S.C. 617, 622, 550 S.E.2d 299, 302 (2001) (holding an action to enforce restrictive covenants by injunction is an equitable action). Because the Association's action is one to enforce restrictive covenants by injunction, it is in equity, and we may find facts in accordance with our own view of the evidence. *Brenco v. S.C. Dep't of Transp.,* 363 S.C. 136,

142, 609 S.E.2d 531, 534 (Ct.App.2005). We acknowledge the superior position of the trial judge to assess witness credibility. We would not, even under *de novo* review, lightly disregard a trial judge's credibility determinations. The resolution of this appeal, however, turns not on a credibility assessment, but on the application of largely undisputed facts to unambiguous restrictive covenants. *Moser v. Gosnell,* 334 S.C. 425, 430, 513 S.E.2d 123, 125 (Ct.App.1999) (holding that when a covenant or contract is clear and unambiguous, matters of construction are questions of law for the court).

## *LAW/ANALYSIS*

The DiPietros contend the master erred in granting the injunction. We agree.

■ We first dispense with the suggestion that because the common area of the Cedar Cove subdivision is involved, the law of trespass governs and trumps the clear language of the restrictive covenants. Where, as here, issues involving the common area of a subdivision—as raised by the pleadings—are resolved by reference to the applicable restrictive covenants, those covenants control. The Association's charge of trespass against the DiPietros emanates solely from the restrictive covenants. Indeed, the Association's Complaint cites no source to support its claim for relief other than the restrictive covenants. This case was pled and tried on the theory that the DiPietros violated the restrictive covenants—specifically Articles V and VI—by failing to properly secure approval for the patio.

Article V of the restrictive covenants controls the resolution of this appeal:

## ARTICLE V

## ARCHITECTURAL CONTROL

No building, fence, wall or other structure shall be commenced, erected or maintained upon the Properties, nor shall any exterior addition to or change or alteration therein be made until the plans and specifications showing the nature, kind, shape, color, height, materials and location of the same shall have been submitted to and approved in

writing as to harmony of external design and location in relation to surrounding structures and topography by the Declarant, or by a designated representative. Such approval shall be determined by consideration of the workmanship, materials, harmony or exterior design with existing structures, and location with respect to topography and grade. **PROVIDED HOWEVER, that if approval or disapproval is not submitted, or no suit to enjoin construction is commenced prior to substantial completion thereof, it shall be presumed that the party has fully complied with this restriction.**

(Emphasis added).

We find that Mike Reed gave "approval" to the patio project, according to the longstanding informal approach to restrictive covenant compliance that existed at the time. In any event, we believe the DiPietros must prevail irrespective of formal approval of the project. It is undisputed that there has *never* been a formal "disapproval" as contemplated by the restrictive covenants. Harder was asked whether his "letter of April 8th [was] intended to be a disapproval of [the] project?" Harder answered, "No." The goal sought by the Association in the April 8 letter was "to stop, talk, and try to come to a resolution." Association representatives, however, understood well that Rudy intended to finish the project, and yet the Association took no action until months later after the patio was completed. The Association, which claims a desire for strict compliance with the covenants, may not escape from its own lack of compliance with the restrictive covenants.

■ We are then left with the provision that compliance with the restrictive covenants "shall be presumed ... [if] no suit to enjoin construction is commenced prior to substantial completion thereof." It is unchallenged, and the master so found, that after the April 8 letter and prior to this action, the DiPietros "proceeded to complete the project." We adhere to the unambiguous terms of the restrictive covenants.[3] Accord-

---

3. We reach this result without the aid of the settled principle that "[r]estrictive covenants are to be construed most strictly against the grantor and persons seeking [to] enforce them, and liberally in favor of the grantee, all doubts being resolved in favor of a free use property and

ingly, we hold the DiPietros are entitled to the presumption of compliance and that the granting of the injunction was therefore in error. *See Sea Pines Plantation Co. v. Wells,* 294 S.C. 266, 270, 363 S.E.2d 891, 894 (1987) (noting that restrictive covenants are voluntary contracts between the parties, and courts should enforce such contracts unless they are indefinite or violate public policy).

Our reversal of the injunction based on a straightforward application of Article V of the restrictive covenants is further supported by our firm view that a balancing of the equities compels the denial of injunctive relief. *See Wells,* 294 S.C. at 274, 363 S.E.2d at 896 ("A court does not automatically issue a mandatory injunction once it finds a restrictive covenant has been violated [as][t]he court must balance the equities between the parties. . . ."); *Hunnicutt v. Rickenbacker,* 268 S.C. 511, 515, 234 S.E.2d 887, 889 (1977) ("[I]t is not every case of a structure erected in violation of a restriction which will call for [a mandatory injunction]."); *Rabon v. Mali,* 289 S.C. 37, 40, 344 S.E.2d 608, 610 (1986) (holding equity will refuse her aid when a party, knowing his rights, suffers his adversary to incur expenses, enter into obligations, or otherwise change his position before asserting a claim for enforcement, "especially if an injunction is [requested]"); *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime,* 307 S.C. 339, 344–45, 415 S.E.2d 384, 387–88 (1992) (holding a horizontal property regime waived its right to enforce a restrictive covenant by failing to bring a claim for enforcement against a known violation until after a substantial amount was spent on improvements). Having reversed the mandatory injunction, we do not reach the DiPietros' remaining assignments of error. *Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting that an appellate court need not address the remaining issues when disposition of a prior issue is dispositive).

## CONCLUSION

We find that under the terms of the restrictive covenants the Association is not entitled to a mandatory injunction

against restrictions." *Sprouse v. Winston,* 212 S.C. 176, 184, 46 S.E.2d 874, 878 (1948) (quoting 26 C.J.S. *Deeds,* § 163).

requiring the removal of the patio. The order of the master granting the injunction is

**REVERSED.**

HEARN, C.J., concurs, and ANDERSON, J., dissents in a separate opinion.

ANDERSON, J. (dissenting in a separate opinion):

I disagree with the majority's reasoning and analysis. I **VOTE** to **AFFIRM.**

## *FACTUAL/PROCEDURAL BACKGROUND*

Margaret and Rudy DiPietro are the owners of Lot 5 in the Cedar Cove Subdivision and have resided there since 1998. The subdivision is governed by the Cedar Cove Homeowners' Association (the Association), a non-profit corporation organized and existing under the laws of South Carolina. Management of the Association is governed by the By-Laws. Both the common areas of the subdivision and Lot 5 are subject to the Declaration of Covenants, Conditions, and Restrictions for Cedar Cove Subdivision (the restrictive covenants).

Pursuant to the restrictive covenants, to gain approval for exterior work on one's home, an owner must submit plans to the architectural review committee. The plans are then presented to the Board for final approval. In 2001, the DiPietros made an oral application to the Chairman of the Architectural Control Committee, Clark Cowsert, for approval to construct a brick patio behind their residence. Cowsert visually inspected the proposed project and assisted the DiPietros in laying out the plan. There is a question as to whether the plan contemplated an encroachment onto the common areas of the Association. No written approval of the project was ever issued. Cowsert only had authority to recommend the project to the Board of Directors. He could not approve any project himself.

Prior to completion of the DiPietros' addition, the Board membership changed. The new Board considered the project and determined that it had no authority to consent to an encroachment onto the common areas. The Board instructed the DiPietros to cease work and directed them to remove the

portion of the patio that encroached on the common areas. Mr. DiPietro informed the Board he had permission from the previous Board and he did not intend to stop construction. The Board concluded that though there may have been some previous level of approval, the current project extended beyond that approval. There is no record as to the extent of the previous approval.

On January 15, 2003, the Association brought an action against the DiPietros alleging trespass and violations of the restrictive covenants. The trial court found the DiPietros violated the covenants and committed trespass in building the patio. The court ordered the DiPietros to remove that portion of the brick patio that encroaches onto the common areas. The DiPietros' deck extends into the common area, but the Board has not asked that it be removed due to the possible expense. The DiPietros' Motion to Reconsider was denied.

## STANDARD OF REVIEW

The DiPietros raise numerous issues on appeal, most of which can be divided between Cedar Cove's claim involving trespass and its claim for violations of the restrictive covenants. "When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Kiriakides v. Atlas Food Systems & Services, Inc.*, 338 S.C. 572, 580, 527 S.E.2d 371, 375 (Ct.App.2000) (citation omitted), *aff'd as modified*, 343 S.C. 587, 541 S.E.2d 257 (2001).

A trespass action is an action at law. *Butler v. Lindsey*, 293 S.C. 466, 469, 361 S.E.2d 621, 622 (Ct.App.1987) (citing *Uxbridge Co. v. Poppenheim*, 135 S.C. 26, 133 S.E. 461 (1926); *Corley v. Looper*, 287 S.C. 618, 340 S.E.2d 556 (Ct.App.1986)); *see also* Black's Law Dictionary 1508 (7th ed. 1999) (defining trespass as "a legal action for injuries."). On appeal from an action at law that was tried without a jury, the appellate court can correct errors of law, but the findings of fact will not be disturbed unless found to be without evidence which reasonably supports the judge's findings. *Townes Assocs. Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976); *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 594 S.E.2d 485 (Ct.App. 2004) (citing *Cohens v. Atkins*, 333 S.C. 345, 509 S.E.2d 286

(Ct.App.1998)); *Sherman v. W & B Enterprises, Inc.,* 357 S.C. 243, 592 S.E.2d 307 (Ct.App.2003).

An action to enforce restrictive covenants by injunction is in equity. *Holling v. Margiotta,* 231 S.C. 676, 679, 100 S.E.2d 397, 398 (1957); *Gibbs v. Kimbrell,* 311 S.C. 261, 267, 428 S.E.2d 725, 729 (Ct.App.1993). On appeal, in an equitable action tried by a master alone, this Court is able to find facts in accordance with its own view of the evidence. *Townes,* 266 S.C. at 86, 221 S.E.2d at 775 (citing *Crowder v. Crowder,* 246 S.C. 299, 143 S.E.2d 580 (1965)); *Floyd v. Floyd,* 365 S.C. 56, 93, 615 S.E.2d 465, 485 (Ct.App.2005). "However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility." *Floyd,* 365 S.C. at 93, 615 S.E.2d at 485 (citing *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 105, 531 S.E.2d 287, 291 (2000)); *accord Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).

## *LAW/ANALYSIS*

### I. Trespass

The DiPietros argue the trial court erred in applying the law of trespass as they have an "undivided interest in the common areas" and a "right and easement of enjoyment in and to the common area." I disagree.

Trespass is an intentional tort. *Snow v. City of Columbia,* 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct.App.1991) "Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *West v. Newberry Elec. Co-op.,* 357 S.C. 537, 544, 593 S.E.2d 500, 503 (Ct.App.2004) (quoting *Hedgepath v. Am. Telephone and Telegraph Co.,* 348 S.C. 340, 559 S.E.2d 327 (Ct.App.2001)); *accord Silvester v. Spring Valley Country Club,* 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct.App.2001). As this Court stated in *Hawkins v. City of Greenville,* 358 S.C. 280, 594 S.E.2d 557 (Ct.App.2004),

"To constitute actionable trespass, however, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion." *Snow v. City of Columbia,* 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct.App.1991); *accord Mack v. Edens,* 320 S.C. 236, 240, 464 S.E.2d 124, 127 (Ct.App.1995). The gist of trespass is

the injury to possession, and generally either actual or constructive possession is sufficient to maintain an action for trespass. *Macedonia Baptist Church v. City of Columbia,* 195 S.C. 59, 71, 10 S.E.2d 350, 355 (1940).

*Hawkins,* 358 S.C. at 296–97, 594 S.E.2d at 565–66.

In *Snow v. City of Columbia,* we instructed,

The unwarrantable entry on land in the peaceable possession of another is a trespass, without regard to the degree of force used, the means by which the enclosure is broken, or the extent of the damage inflicted. *Lee v. Stewart,* 218 N.C. 287, 10 S.E.2d 804 (1940). The entry itself is the wrong. Thus, for example, if one without license from the person in possession of land walks upon it, or casts a twig upon it, or pours a bucket of water upon it, he commits a trespass by the very act of breaking the enclosure. *See Moore v. Duke,* 84 Vt. 401, 80 A. 194 (1911); 1 G. Addison, A TREATISE ON THE LAW OF TORTS, 388 (Wood ed. 1881); Restatement 2d of Torts, 158, comment i, illustration 3 (1965). It is immaterial whether any further damage results. *See Brown Jug, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 959,* 688 P.2d 932 (Alaska 1984). The mere entry entitles the party in possession at least to nominal damages. *Lee v. Stewart, supra.* To constitute an actionable trespass, however, there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion. *Alabama Power Co. v. C.G. Thompson,* 278 Ala. 367, 178 So.2d 525 (1965). Trespass does not lie for nonfeasance or failure to perform a duty. *Id.*

Intent is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from his act. *Snakenberg v. Hartford Casualty Insurance Co.,* 299 S.C. 164, 383 S.E.2d 2 (Ct.App. 1989). Although neither deliberation, purpose, motive, nor malice are necessary elements of intent, the defendant must intend the act which in law constitutes the invasion of the plaintiff's right. *Id.* Trespass is an intentional tort; and while the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's

land. *See Phillips v. Sun Oil Co.,* 307 N.Y. 328, 121 N.E.2d 249 (1954); *Lee v. Stewart, supra* (it is immaterial whether defendant in committing the trespass actually contemplated the resulting damage to plaintiff).

*Snow,* 305 S.C. at 552–53, 409 S.E.2d at 802.

The essence of trespass is the unauthorized entry onto the land of another. *Ravan v. Greenville County,* 315 S.C. 447, 464, 434 S.E.2d 296, 306 (Ct.App.1993). "The distinction between trespass and nuisance is that trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property, whereas nuisance is a substantial and unreasonable interference with the plaintiff's use and enjoyment of his property." *Silvester,* 344 S.C. at 286, 543 S.E.2d at 566 (citation omitted); *see also* F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 427 (2d ed. 1997) ("The requirement of a physical entry distinguishes trespass from nuisance, which protects the right to *enjoyment* of land rather than the right of *possession.*").

## II. Homeowners' Associations/Trespass Actions Against Residents

The DiPietros argue that the patio cannot be considered a trespass as they have an interest in the common area. The "common area" is defined in the By–Laws and the restrictive covenants as "all real property owned by the Association for the common use and enjoyment of the owners." The issue of whether homeowners' associations may maintain trespass actions against residents is novel in South Carolina. The By–Laws as well as South Carolina law concerning trespass is instructive. My research of other jurisdictions reveals only one state analyzing a homeowners' association's action for trespass. In *Pine Knoll Ass'n, Inc. v. Cardon,* 126 N.C.App. 155, 484 S.E.2d 446 (1997), the court stated the property owners' association did not establish unauthorized entry onto the association's seawall, and thus, failed to establish a trespass claim, where the landowner was an association member and association members had a right to use common properties. *Id.* at 448.

The DiPietros liken their interest in the common areas to that of ownership and state: "ownership, together with a right of possession, is a defense to liability for trespass." However,

their rights, as defined in the By–Laws and the restrictive covenants only extend to the "common use and enjoyment" of the area. The Association is the owner. The DiPietros were essentially given consent to use and enjoy the common area, but not to go beyond the type of use contemplated in the By–Laws and the restrictive covenants. A trespass may be accomplished by going beyond the consent given for the original entry. *See Groce v. Greenville, S. & A. Ry. Co.,* 94 S.C. 199, 78 S.E. 888 (1913) (holding that if the entry for the purpose of construction was made under the grant or by consent, actual or presumed, the defendant would nevertheless be liable for any trespass committed outside the right of way granted or for any invasion of the property rights of the plaintiff not incident to the proper location and construction of its road, just as it would be in case of an entry without such consent); *Burnett v. Postal Telegraph & Cable Co.,* 79 S.C. 462, 60 S.E. 1116 (1908) (holding that if a company which is given permission to enter on land and construct a line of telegraph wires thereon constructs it in a different place than that designated by the owner, it is guilty of a trespass, and the owner in suing for damages is not confined to a remedy under the condemnation statutes which apply when the entry is by permission and the acts done on the land are incident to the exercise of the right granted by the owner).

By building a patio that encroached onto the common areas owned by the Association, the DiPietros went beyond the original consent given by the Association for the use and enjoyment of the common areas. It is clear from the record that the patio built by the DiPietros encroaches onto the common areas by up to 4.2 feet. In their trial testimony, the DiPietros admitted their right to use the common areas was not absolute and was subject to limitations. For example, they conceded that they could not build a residence on the common areas but could walk over the area. To the extent that the patio encroaches onto the common area, the encroachment constitutes a trespass.

The DiPietros additionally argue the trial court erred in finding the DiPietros do not have a legal or equitable interest in the common area, because their rights are limited to the same rights "that a shareholder in a corporation would have, essentially none." However, the trial court used this state-

ment merely as an analogy. It was made in reference to the fact that the Association is a corporation, and the DiPietros are members of the corporation with no substantial rights involving the decisions of the Association concerning the common areas.

The DiPietros specifically dispute the following findings of fact by the trial court concerning the trespass: the trial court's finding that the patio is solely for the DiPietros' personal use; the trial court's finding concerning the patio as an enhancement; the trial court's finding concerning the purpose of the patio as constructed and maintained for the benefit of the other homeowners; and the trial court's finding whether there was a prohibition against the DiPietros from beautifying and enhancing the common area in a way that does not interfere with any other homeowner's right to use the area. However, evidence was presented at trial that reasonably supports the trial court's findings of fact. *See Townes Assoc. Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) (noting that on appeal from an action at law tried without a jury, the findings of fact will not be disturbed unless the findings are not reasonably supported by the evidence). Furthermore, the disputed facts, even if found to be incorrect, would not alter the determination that the patio constitutes a trespass. That the patio may be an enhancement or for the neighborhood's benefit is not a defense to trespass.

### III. Restrictive Covenants

The DiPietros argue the trial court erred in finding the DiPietros violated the restrictive covenants and in requiring them to remove the portion of their patio that extends into the common area. I disagree.

The DiPietros raise numerous arguments concerning the restrictive covenants, beginning with the contention that the trial court erred in finding the DiPietros violated Articles V and VI of the restrictive covenants. Article V (Architectural Control) of the restrictive covenant states:

No building, fence, wall or other structure shall be commenced, erected or maintained upon the Properties, nor shall any exterior addition to or change or alteration therein be made until the plans and specifications showing the

nature, kind, shape, color, height, materials and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Declarant, or by a designated representative. Such approval shall be determined by consideration of the workmanship, materials, harmony or exterior design with existing structures, and location with respect to topography and grade. PROVIDED HOWEVER, that if approval or disapproval is not submitted, or no suit to enjoin construction is commenced prior to substantial completion thereof, it shall be presumed that the party has fully complied with this restriction.

Article VI refers to restrictions on the use of the property.

"Restrictive covenants are contractual in nature." *Seabrook Island Property Owners' Ass'n v. Berger*, 365 S.C. 234, 239, 616 S.E.2d 431, 434 (Ct.App.2005.) (internal quotation marks omitted) (quoting *Hoffman v. Cohen*, 262 S.C. 71, 75, 202 S.E.2d 363, 365 (1974)); *see also Seabrook Island Property Owners Ass'n v. Pelzer*, 292 S.C. 343, 347, 356 S.E.2d 411, 414 (Ct.App.1987) ("Restrictive covenants are contractual in nature and bind the parties thereto in the same manner as any other contract.") (citing *Palmetto Dunes Resort v. Brown*, 287 S.C. 1, 336 S.E.2d 15 (Ct.App.1985)). "The word 'covenant' means to enter into a formal agreement, to bind oneself in contract, and to make a stipulation." 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1.1 (footnotes omitted).

In *Sea Pines Plantation Co. v. Wells*, 294 S.C. 266, 363 S.E.2d 891 (1987), our supreme court edified:

The historical disfavor of restrictive covenants by the law emanates from the widely held view that society's best interests are advanced by encouraging the free and unrestricted use of land. *See, Hamilton v. CCM, Inc.*, 274 S.C. 152, 263 S.E.2d 378 (1980); *Edwards v. Surratt*, 228 S.C. 512, 90 S.E.2d 906 (1956). *See also, Knox v. Scott*, 62 N.C.App. 732, 303 S.E.2d 422 (1983). Courts tend to strictly interpret restrictive covenants and resolve any doubt or ambiguities in a covenant on the presumption of free and unrestricted land use. *Edwards v. Surratt, supra.* Thus, to enforce a restrictive covenant, a party must show that the

restriction applies to the property either by the covenant's express language or by a plain unmistakable implication. *Hamilton v. CCM, Inc., supra; see also, Davey v. Artistic Builders, Inc.,* 263 S.C. 431, 211 S.E.2d 235 (1975).

The rule of strict construction governing restrictive covenants does not preclude their enforcement. A restrictive covenant will be enforced if the covenant expresses the party's intent or purpose, and this rule will not be used to defeat the clear express language of the covenant. *Palmetto Dunes v. Brown,* 287 S.C. 1, 336 S.E.2d 15 (1985); *Hamilton v. CCM, Inc., supra. See generally, Vickery v. Powell,* 267 S.C. 23, 225 S.E.2d 856 (1976); *Hoffman v. Cohen,* 262 S.C. 71, 202 S.E.2d 363 (1974). This restrictive covenant is a voluntary contract between the parties. Courts shall enforce such covenants unless they are indefinite or contravene public policy. *Vickery v. Powell, supra.*

*Sea Pines,* 294 S.C. at 270, 363 S.E.2d at 893–94.

A covenant may run with the land where there is "an indication that the parties intended for the covenant to run with the land." *Charping v. J.P. Scurry & Co., Inc.,* 296 S.C. 312, 315, 372 S.E.2d 120, 122 (Ct.App.1988) (citing *Cheves v. City Council of Charleston,* 140 S.C. 423, 138 S.E. 867 (1927)). In *Epting v. Lexington Water Power Co.* 177 S.C. 308, 320, 181 S.E. 66, 71 (1935), the court explained that covenants running with the land must "relate to the realty demised, having for its object something annexed to, or inherent in, or connected with the land; that its performance or nonperformance must affect the nature, quality, value, or mode of enjoyment of the demised premises; and in this State, certainly, the mere fact of its being a part of the consideration is not sufficient."

Restrictive covenants often authorize the creation of a homeowners' association, usually in the form of a not-for-profit corporation, and grant it authority to manage common areas, make regulations, levy assessments, and other similar privileges. Homeowners' associations are contractually limited by the restrictive covenants establishing them.

While homeowners' associations typically have the power to regulate the use of common areas, their regulations

cannot prohibit a usage contrary to any restrictions creating easements or rights of use of property in owners.

17 S.C. Jur. *Covenants* § 88 (1993 & Supp. 2005) (footnotes omitted) (citing *Lovering v. Seabrook Island Property Owners Ass'n*, 289 S.C. 77, 344 S.E.2d 862 (Ct.App.1986), modified, 291 S.C. 201, 352 S.E.2d 707 (1987); *Seabrook Island Property Owners Ass'n v. Pelzer*, 292 S.C. 343, 356 S.E.2d 411; *Battery Homeowners Ass'n v. Lincoln Fin. Resources*, 309 S.C. 247, 422 S.E.2d 93 (1992)).

Covenants that restrict the free use of property must be strictly construed against limitations upon the property's free use. *Hyer v. McRee*, 306 S.C. 210, 212, 410 S.E.2d 604, 605 (Ct.App.1991). Where there is doubt, the doubt must be resolved in favor of the property's free use. *Id.* As voluntary contracts, restrictive covenants will be enforced unless they are indefinite or contravene public policy. *Sea Pines Plantation Co. v. Wells*, 294 S.C. 266, 270, 363 S.E.2d 891, 894 (1987).

In *Sprouse v. Winston*, the supreme court observed:

> The rule of construction applicable here is set forth in 26 C.J.S., Deeds, § 163:
>
>> 'Restrictive covenants are to be construed most strictly against the grantor and persons seeking [to] enforce them, and liberally in favor of the grantee, all doubts being resolved in favor of a free use of property and against restrictions. This rule, however, obtains only where the parties have failed to express their meaning with sufficient clarity to enable the court to say that its construction is plain and admits of no doubt; the rule will not be applied to defeat the obvious purpose of the restriction, nor does it require an unnatural and strained construction of the words used; and before giving effect to the rule the court will have recourse to every aid, rule, or canon of construction to ascertain the intention of the parties, since it is the duty of courts to enforce, not to make, contracts.'
>
> Further quoting C.J.S., Deeds, § 163, it is stated:
>
>> 'Words used are to be taken in their ordinary and popular sense, unless they have acquired a peculiar and special meaning in the particular relation in which they appear, or with respect to the particular subject matter, or unless

it appears from the context that the parties intended to use them in a different sense.  * * * '

212 S.C. 176, 184–85, 46 S.E.2d 874, 878 (1948). *See also Forest Land Co. v. Black,* 216 S.C. 255, 57 S.E.2d 420 (1950) ("The fundamental rule in construing covenants and restrictive agreements is that the intention of the parties as shown by the agreement, governs.").

There are numerous cases throughout the country with facts similar to those in the instant case.  In *Wescott v. Burtonwood Manor Condominium Ass'n Bd. of Managers,* 743 S.W.2d 555 (Mo.App.1987), the court held that condominium unit owners' construction of improvements without permission of the condominium association board of managers, and in violation of condominium by-laws, warranted the issuance of a mandatory injunction to remove flood retaining walls and glass greenhouse covers from common elements, even though they had been erected to prevent flood damage to the owners' units. *Id.* at 561.  Similarly, in *The Fountains of Palm Beach Condominium, Inc. v. Farkas,* 355 So.2d 163 (Fla.Dist.Ct.App. 1978), the court upheld an injunction where the defendant/owner's husband attempted to obtain permission for the construction of a patio on the common elements.  The management firm told the owner it had no objections, and the board of directors of the condominium association informed him that they had no legal status and were therefore unable to grant or deny permission. *Id.* at 163.  The owner proceeded with construction, and the association filed suit seeking a mandatory injunction requiring the removal of the patio slab at the owner's expense. *Id.* The Declaration of Condominium provided that each owner agreed not to make structural additions or alterations to his unit and not to make alterations of the common elements without the prior written consent of the management firm and the association. *Id.* at 164.  The declaration provided for the remedy of injunction to seek compliance with the provisions of the declaration. *Id.* The court granted a mandatory injunction requiring the removal of the patio slab, even though defendant argued that the failure of the management firm and the association to object to her intentions should operate as an estoppel or as a waiver of the association's right to complain after the patio slab had been laid. *Farkas,* 355 So.2d at 164.

Though it is not clear in the trial court's order which section of Article VI the DiPietros violated, it is not necessary to find the DiPietros violated Article VI at all, as they violated Article V. The DiPietros failed to seek approval as contemplated by the restrictive covenants prior to construction of their patio and did not stop construction when instructed to by the Board. The DiPietros rely heavily on an exception in the restrictive covenants which provides that "if approval or disapproval is not submitted, or no suit to enjoin construction is commenced prior to substantial completion thereof, it shall be presumed that the party has fully complied with this restriction." However, the evidence presented at trial supports the finding that the patio was not substantially complete prior to the letter informing the DiPietros to cease construction. The bricks for the patio had not been laid when the letter was delivered.

While "[a] court does not automatically issue a mandatory injunction once it finds a restrictive covenant has been violated as the court must balance the equities between the parties," the instant case merits an injunction. *Sea Pines Plantation Co. v. Wells*, 294 S.C. 266, 363 S.E.2d 891 (1987).

"The right to enforce a restrictive covenant is not limited to mere preventive action, but will, in a proper case, extend to requiring a defendant, by mandatory injunction, to repair an injury already done, or to remove a structure already erected.... However, it is not every case of a structure erected in violation of a restriction which will call for such relief. The issuance of a mandatory injunction depends upon the equities between the parties, and it rests in the sound judicial discretion of the court whether such an injunction should be granted. Where a great injury will be done to the defendant, with very little if any to the plaintiff, the courts will deny equitable relief."

*Hunnicutt v. Rickenbacker*, 268 S.C. 511, 515–16, 234 S.E.2d 887, 889 (1977) (quoting 29 Am.Jur.2d *Covenants, etc.*, § 328). This is not a case where the harm to the DiPietros would outweigh the benefit to the Association. The trial court found that the patio may be easily removed, and the testimony supports this finding.

The DiPietros specifically dispute the following findings of fact concerning the restrictive covenants: the trial court's

failure to find approval of the patio by the Board; the finding that work was commenced "some months later" after the initial meeting with Cowsert; the failure to find evidence of action other than a telephone call with the chairman; and the finding that the DiPietros "conceded that they submitted no written proposal as required by the covenants." The evidence supports all of these findings of fact. The evidence submitted at trial supports the finding that there was a delay in beginning construction of the patio from the time Mr. DiPietro met with Clark Cowsert. Mr. Cowsert stated, in response to the question of whether there was some delay, "I think so." Other than a telephone call from the Chairman of the Committee to the Chairman of the Board, there was no evidence of any action on the DiPietros' application. The trial court apparently was referring to action by the Board itself and not by individual members of the Board. Cowsert testified that he did not have the ability to grant permission; he only had the authority to recommend approval to the Board. Though it was asserted that Mike Reed gave the DiPietros permission, he did not testify at trial. Lastly, the DiPietros argue that because they showed Cowsert a drawing of the design for the patio, it should constitute a written request. The trial court determined this was not the type of written request contemplated by the restrictive covenants and this conclusion is supported by the evidence.

## IV. Additional Arguments Concerning Findings of Fact

The DiPietros raise numerous additional arguments concerning findings of fact by the trial court. These arguments stem from the trial court's order, but do not necessarily relate to either the claim of trespass or the violation of restrictive covenants. I find these arguments unpersuasive.

The DiPietros contend the trial court erred in finding that they ignored the letter of April 8, 2002. This finding is completely supported by the evidence at trial. Mr. DiPietro readily admitted that work did not cease after the receipt of the letter, and even though he knew the Board wanted him to stop building the patio, he continued. The DiPietros maintain the trial court erred in failing to find that the Association's lawsuit against the DiPietros was motivated by spite and a personal vendetta. I agree with the trial court that the

DiPietros failed to support this argument at trial. Other than Mr. DiPietro's own testimony that he thought it was a vendetta, no other evidence was presented at trial that would support such an accusation. There was evidence that other encroachments exist in the neighborhood that have not been the subject of litigation, but no evidence was submitted of other encroachments, unfinished at the time of the new Board that were overlooked. In fact, the evidence showed that the new Board took initiative in making sure homeowners complied with the building requirements with a letter issued March 15, 2002, asking that homeowners wishing to build submit requests to the committee for approval.

The DiPietros contend the trial court erred in failing to find that the patio was approved and substantially complete prior to the appellant's receiving the request to cease and in finding an ouster. I find no error. The DiPietros further argue the trial court erred in finding no written document granting an easement in the common areas. However, the trial court's order actually stated, "There is no written document granting the Defendants any easement or permission to maintain the encroachment." In its order, the trial court was clearly referring to approval of the encroachment after it was built, not a prior easement. The final three issues raised by the DiPietros are general complaints concerning the decision of the trial court, and do not need to be dealt with individually as the specifics of these arguments were dealt with in the analysis of other issues raised.

## *CONCLUSION*

I would hold that an action for *TRESPASS* may be maintained by a homeowners' association against a resident homeowner in regard to the common elements property. I would rule that an action for *VIOLATION OF RESTRICTIVE COVENANTS* may be utilized by a homeowners' association against a resident homeowner in regard to the common elements property.

In my view, the homeowners' association proved the theories of *TRESPASS* and *VIOLATION OF RESTRICTIVE COVENANTS* against the resident homeowners in reference

to the common elements property. Accordingly, I **VOTE** to **AFFIRM.**