688 S.E.2d 555

**RV RESORT AND YACHT CLUB OWNERS ASSOCIATION, INC., Jean Littell, Kathy Fudge, Dwight Blakeslee, Herb Hook, Stan Bronson, Peg Bender, and Claudette Delpesco, on behalf of all members of the Association similarly situated Individually, Respondents,**

v.

**BILLYBOB'S MARINA, INC., d/b/a Outdoor RV Resort and Yacht Club, Petitioner.**

No. 26760.

Supreme Court of South Carolina.

Heard Nov. 18, 2009.

Decided Jan. 19, 2010.

Rehearing Denied Feb. 17, 2010.

314

James B. Richardson, Jr., of Columbia, for Petitioner.

John R.C. Bowen, of Laughlin & Bowen, of Hilton Head Island, and Stephen Spitz, of Charleston, for Respondents.

Justice BEATTY.

This matter concerns a fee dispute between the RV Resort and Yacht Owners Association (the Association), which operated a resort for recreational vehicle (RV) travelers, and Billy-

Bob's Marina, Inc. (BillyBob), the successor to the resort's developer. We granted BillyBob's petition for a writ of certiorari to review the decision of the Court of Appeals, which held BillyBob had breached provisions governing the condominium regime by failing to collect and/or to remit in full three fees imposed for road maintenance, electricity, and telephone service. *RV Resort & Yacht Owners Ass'n v. BillyBob's Marina, Inc.,* Op. No.2007–UP–556 (S.C. Ct.App. filed Dec. 14, 2007). We reverse.

## FACTS

In 1981, the RV Resort and Yacht Club (the Resort) was established as a condominium regime on Hilton Head Island in Beaufort County by Outdoor Resorts, RV Resort and Yacht Club, a South Carolina General Partnership (the developer). Covenants [1] governing the Resort and the Association were recorded in June 1981.

By-laws for the Association were instituted in a separate document that was incorporated by reference into the Covenants. The developer created the Association, a nonprofit corporation, to be responsible for operating the property and maintaining the common areas. Membership in the Association is limited to lot owners.

The Resort consists of a subdivision of approximately 200 lots on which travelers can park RVs. There is also a marina and other amenities. The developer retained sole ownership of the marina.

The lots are individually owned as part of the regime, and the lot owners have an undivided interest in the common areas, which include the water, sewer, and electrical distribution systems, the roads within the property, the parking area, and the swimming pool, bath houses, and other facilities. The Association, through its Board of Directors, has the power under Article VI of the Covenants to impose on the lot owners assessments necessary for the upkeep and maintenance of the common areas.

---

1. "Declaration of Covenants and Restrictions for Outdoor Resorts, R.V. Resort and Yacht Club *AND* Provisions for the R.V. Resort and Yacht Club, Owners' Association, Inc."

When the lots are not being used by the lot owner, they are available for rent to the public. Under Article VII of the Covenants, entitled Rental of Lots, the developer has "the exclusive right" to rent the lots when the lot owners are absent "at scheduled rates promulgated from time to time by the Developer." For its services, the developer was authorized to retain 50% of the gross rental amount collected on any lot, with the remaining 50% to be paid to the lot owner.

Although there was no specific provision in the Covenants, the original developer began collecting as part of the rent $2.00 per day for electricity[2], which the developer paid to the lot owners. On April 27, 1999, Dwight Blakeslee, President of the Association, wrote to the developer (as of this point, Sanwater Resorts, Inc. had taken over as the developer) to request that the developer increase the daily rental rate by $1.00, which the Association could then "siphon off" to go into a fund to finance road resurfacing; the Association also requested an increase in the electric allotment to the lot owner from $2.00 to $3.00 per night due to the larger size of the vehicles utilizing the resort:

> As you know the Developer sets the rental rates for this Resort. The Board of Directors [of the Association] has two concerns that would require an increase in rates. First, we would like to be able to *siphon off the rental rate one dollar per rental night to put into road resurfacing,* and second, with the increase in size and technology in the rigs now renting here, we would like to increase the electric allotment to the lot owner to three dollars per rental night. This could be accomplished by raising the nightly rental rate by two dollars per night. (Emphasis added.)

The developer did not immediately respond to the Association's request for an increase in the rental rates, and the rates remained unchanged. In May 1999, the developer entered into a contract to sell its interests in the Resort (and the marina) to Robert and Arleen Stelmack, who owned BillyBob.

---

2. Each lot was separately metered and the utility billed the individual lot owners each month for service. There is no provision in the Covenants that requires lot owners to provide electricity or telephone service to lot renters.

Thereafter, by letter of June 23, 1999, the developer agreed to the Association's request "for a $2.00 increase in the nightly rental," i.e., $1.00 for the new road fee (to be paid to the Association) and an additional $1.00 for electricity ($3.00 per night instead of $2.00, to be paid to the lot owner). In July 1999, it was agreed that the changes in the rental rates would not be effective until the next operating quarter, set to begin September 15, 1999.[3]

Following these negotiations, the developer finalized a sale of its interests to BillyBob in late August 1999, officially making BillyBob the successor to the developer at that time. After the sale, BillyBob collected the daily electricity fee of $3.00 as part of the rental charges and remitted it to the lot owners. In addition, BillyBob collected the newly-implemented road fee and remitted it to the Association.

BillyBob also initiated a higher rental charge of $2.00 extra per night for lots with telephone service, of which BillyBob paid the lot owners 50%, or an additional $1.00 per night, in accordance with Article VII of the Covenants, which required the developer to split all gross rental proceeds equally with the lot owners.

By letter dated October 17, 1999, BillyBob's president, Robert Stelmack, formally advised the Association that, although it had been temporarily collecting a "pass-through charge" of $3.00 per day for electricity from renters, effective November 1, 1999, it would raise the daily rental charge and simultaneously cancel the separate electricity pass-through charge of $3.00 per night, so that the net amount to the lot owners would remain the same.

In a second letter to the Association also dated October 17, 2009, BillyBob's president stated that, regarding the $1.00 road fee, "[i]n consideration for BillyBob's collection of this fee, it is requested that the Association pass a resolution or amendment committing the Association to maintain/repair the roads that are the property of the 'Developer' in the same manner and state of repair as the roads that are the property of the Association."

---

**3.** Whether or not the developer's letter constitutes a binding amendment to the Covenants was not raised and we offer no opinion as to its efficacy.

The Association rejected BillyBob's request to undertake maintenance and repairs of BillyBob's roads, and it objected to BillyBob's decision to cancel the separate electricity fee. The Association also objected to BillyBob's handling of the increased rental proceeds from lots with telephone service, asserting all of the extra rental proceeds, not just 50%, should be remitted to the lot owners because the lot owners separately paid for their telephone charges on the lots.

On November 1, 1999, BillyBob ceased collection of both the separate electricity fee and the road fee pursuant to its earlier notifications. BillyBob sent a letter to lot owners on November 7, 1999 regarding the changes. BillyBob explained that renters were confused by, and objected to, separate charges for electricity on their bills. Under the new rate structure, there would be no separate collection for electricity charges and, in the future, any increases in the rental rates would be equally divided between the developer and the lot owners as provided by the Covenants, thus eliminating pass-through charges.

The Association (and its Board of Directors)[4] filed the current action against BillyBob alleging several of BillyBob's actions as the successor developer had violated the Covenants and other provisions. The matter was referred to a special referee, who issued an initial order dated March 19, 2004, addressing numerous matters (some of which are no longer in dispute) and ordering an accounting. As relevant here, the referee found BillyBob had violated the Covenants[5] by (1) "[r]efusing to collect and remit to [the Association] a reasonable charge imposed for use of [the Association's] roads" and (2) "[f]ailing to remit to [M]embers [members of the Association, i.e., the lot owners] 100% of monies collected from renters by BillyBob for use of Members' electricity and telephone service."

The referee further found that, under the Covenants, the Association had the exclusive right to, and had adopted with

---

4. References to the Association shall include the board where appropriate.

5. The referee found that certain amendments to the Covenants were invalid and that the applicable version was the original, 1981 version. No challenge is made to this finding.

the developer's approval, certain rules and regulations, and that the Association had imposed the following charge: "The Developer is required to pay to [the Association] the sum of $1.00 per rental night for each lot rented for the road fund." The referee stated BillyBob did not have the authority to rescind the Association's rules and regulations. The referee additionally found BillyBob had departed from the course of dealing between the developer and the lot owners since 1981 by declining to collect and remit the road fee and by remitting only 50% of the electrical charges collected by it to the lot owners.

By final order filed June 30, 2006, the referee found the Association was entitled to damages of $48,447.50 for monies that BillyBob should have collected and turned over to the Association for the road fund, and that the Association was further due $145,831.50 for electricity charges and $1,048.50 for telephone service (with the Association responsible for disbursing the electricity and telephone charges to the appropriate lot owners), for a total judgment of $195,327.50, plus attorney's fees and costs. In this final order, the referee additionally found the collection of the electricity fee "was mandated under rules adopted by the [A]ssociation under the Covenants and with the approval of the developer."

The Court of Appeals affirmed the rulings regarding the three fees, as well as another issue that is no longer in dispute, but reversed the award of attorney's fees. *RV Resort & Yacht Owners Ass'n v. BillyBob's Marina, Inc.*, Op. No. 2007–UP–556 (S.C. Ct.App. filed Dec. 14, 2007). In affirming, the Court of Appeals stated: "The Covenants grant the Association the right to promulgate rules and regulations without BillyBob's permission. We find BillyBob was required to collect the charges on behalf of the Association and therefore affirm the referee's findings on this issue." *Id.* at 6–7. We granted BillyBob's petition for a writ of certiorari.

## LAW/ANALYSIS

BillyBob argues the Court of Appeals erred in its decision concerning the three fees. We agree.

"Restrictive covenants are contractual in nature." *Hardy v. Aiken*, 369 S.C. 160, 166, 631 S.E.2d 539, 542 (2006).

"The language of a restrictive covenant is to be construed according to the plain and ordinary meaning attributed to it at the time of execution." *Id.* "[T]he paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document." *Taylor v. Lindsey,* 332 S.C. 1, 4, 498 S.E.2d 862, 863–64 (1998) (quoting *Palmetto Dunes Resort v. Brown,* 287 S.C. 1, 336 S.E.2d 15 (1985)).

 An action for a breach of restrictive covenants that seeks monetary damages is an action at law, and we will not disturb the trial court's findings unless they are unsupported by the evidence. *O'Shea v. Lesser,* 308 S.C. 10, 14, 416 S.E.2d 629, 631 (1992) (citing *Townes Assocs. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976)). In contrast, an action to enforce restrictive covenants by means of injunctive relief is an action in equity, and we may find the facts in accordance with our own view of the evidence. *Cedar Cove Homeowners Ass'n v. DiPietro,* 368 S.C. 254, 258, 628 S.E.2d 284, 286 (Ct.App.2006). In this case, the referee expressly ordered a monetary judgment, which is legal in nature.

## I. Road Maintenance Fee.

 The referee and the Court of Appeals appear to hold the road fee was justified under Article VIII of the Covenants because it was implemented as the result of an unspecified regulation passed by the Association.[6] Article VIII of the Covenants, entitled Use and Occupancy, provides in section 8.11 that the Association may make and amend from time to time, without the prior written consent of the developer, "[o]ther reasonable rules and regulations *governing use and occupancy* ... which do not alter or are not in contravention of any of the foregoing provisions...." (Emphasis added.)

After reviewing the record, we conclude the referee and the Court of Appeals erred in finding the Association had passed some form of regulation instituting a road maintenance fee in this case. The only regulations in the record and appendix in this case—"Basic Rules and Regulations, RV Resort & Yacht Club Owner's Association" dated May 10, 1996 and amended

---

6. The Court of Appeals did not rely on the theory, recited by the referee, that the road fee was also justified based on a "course of dealing" that was binding on BillyBob.

February 1999—do not contain any provision for a road fee. The Rules and Regulations concern such matters as the prohibition of clothes lines, campfires, and patio lights, as well as rules regarding pets, the use of the pool, and the use of the tennis courts. There is no formal regulation listed in this regard. Rather, the road fee was approved as an addition to the rental charge by the prior developer.

Article VIII, section 8.11, is not applicable here because there is no evidence that the road fee was established by means of a rule or regulation set by the Association governing use and occupancy.

The Association alternatively asserts the road fee was justifiable under Article XI of the Covenants. The Court of Appeals did not rule on this contention and it is without merit, in any event. Article XI, entitled Developer's Retention of Interest, clearly pertains to the developer's obligation to pay reasonable charges for the *developer's* use of water, electricity, sewage service, and other facilities on the property it retained in the Resort and its right to use the common roads without charge. These circumstances are not present here.

## II. Electricity Fee.

BillyBob next challenges the ruling of the Court of Appeals that it owed sums to the Association for fees it should have collected for electricity and phone service. Specifically, the referee found BillyBob had violated unspecified provisions in the Covenants by "[f]ailing to remit to [M]embers [members of the Association, i.e., the lot owners] 100% of monies collected from renters by BillyBob for use of Members' electricity and telephone service." The referee found the Covenants permitted the Association to develop rules and regulations and that the electricity fee was enacted under these rules and regulations.

The Court of Appeals concluded "[t]he Covenants grant the Association the right to promulgate rules and regulations without BillyBob's permission. We find BillyBob was required to collect the charges on behalf of the Association and therefore affirm the referee's findings on this issue." The Court of Appeals did not expressly state, however, that the

Association had implemented any particular rules or regulations bearing on this matter.

As for the electricity fee, the record does not contain a rule or regulation passed by the Association that requires the collection of an electricity fee. BillyBob was not obligated to continue the collection of a separate charge for electricity. An electricity fee of $2.00 per night was first implemented by the original developer, which collected it as part of the rental fee imposed on those renting lots at the Resort. However, all parties understood it to be a separate and distinct charge from the lot rent. As BillyBob notes, the original developer, in its discretion, decided to add the $2.00 amount. Association board members Jean Littell and Dwight Blakeslee agree that the original developer had the right to cancel the electricity fee at any time, as would a subsequent developer. Dwight Blakeslee, who has been involved in the Resort since its inception, stated in a letter to Association members that the electricity pass-through charge "has always been a management policy set by ORA in all their RV Resorts." He also acknowledged that "[t]here is nothing in the condo document regarding this."

Prior to its departure, the developer (then Sanwater) agreed to increase the electricity fee charged to renters from $2.00 to $3.00, to take effect with the next quarter, which turned out to be after the sale of the Resort to BillyBob had been completed. BillyBob collected the fee when it first purchased the developer's interests, and then chose to eliminate the separate electricity charge.

The Court of Appeals declared, however, that the electricity fee was not part of the rental charge (and thus not under the developer's control) because it was not divided equally between the developer and the lot owners as was the remaining rental amount. Rather, it was "passed through" directly to the lot owners. While we agree with the Court of Appeals that the electricity fee was not controlled by the developer, the treatment of this fee by the prior developer is not dispositive of this issue. The prior developer voluntarily treated the electricity fee as a separate charge distinguishable from the lot rent and collected it as an unitemized portion of the rent and remitted it to the lot owners. Conversely, BillyBob

ceased collecting an electricity fee altogether; therefore, there was no money to remit to the lot owners.

The record in this case does not contain a regulation passed by the Association concerning the electricity fee. Likewise, there is no regulation or covenant that requires lot owners to provide electricity to renters. Moreover, there is no covenant that specifically requires BillyBob [7] to collect an electricity fee. Rather, it is clear from the record that the original developer implemented this charge in its discretion, and the Association later *requested* an increase in this amount (to be paid to the lot owners).

### III. Telephone Service Charge.

■ BillyBob lastly challenges the finding of the Court of Appeals that it was delinquent for failing to pay over the full amount collected for telephone service to the Association.

After its purchase and assumption of the interests of the developer, BillyBob installed telephone service on three lots that it owned in the Resort and sent a letter to all lot owners encouraging them to do the same. Approximately a dozen lot owners installed telephone service on their lots. BillyBob initiated an increase of $2.00 in the nightly rental charge for lots with telephone service. BillyBob split the extra proceeds equally with the lot owners, per the Covenant provision calling for an equal division of all gross rental proceeds.

BillyBob argues the Court of Appeals erred by lumping the telephone charge in with the other issues and finding it had breached the Covenants by remitting 50%, rather than all, of the extra $2.00 rental charge collected on lots with telephone service to the lot owners. BillyBob asserts the Covenants require an equal division of the gross rental proceeds between the developer and the lot owner, which is what it did. Not

7. However, Article VII states "[a]s partial consideration" for the right to rent the lots the developer agrees to undertake certain advertisement obligations; no other consideration is mentioned. It is arguable that the other unspoken consideration was the requirement that the developer act in the best interest of the owners and comply with reasonable requests. This is not an issue raised to this Court, though, and we offer no opinion as to it.

many of the lots had telephone service, and BillyBob stated those that did had more rental value. BillyBob notes that to the extent the Association relies upon Article XI of the Covenants as authority for the proceeds going to the Association, this provision applies to utilities and facilities used by the developer on property it has retained, not to facilities used by the renters who are staying on the lots. Thus, the Association has shown no entitlement to receive (on behalf of the lot owners) the extra rental charge for lots with telephone service.

As currently written, the Covenants require an equal sharing of all gross rental proceeds. BillyBob does not charge a separate fee for telephone service. The lots with telephone service were considered more desirable by renters and commanded a higher rental rate, just as waterfront lots, which cost the lot owners more to acquire, commanded higher rates. Consequently, BillyBob does not owe the Association additional amounts for the rental charges it collected on lots with telephone service.[8]

## CONCLUSION

Based on the foregoing, the decision of the Court of Appeals regarding the three fees is

**REVERSED.**[9]

TOAL, C.J., WALLER, PLEICONES and KITTREDGE, JJ., concur.

---

8. The developer has the exclusive right to provide rental services of the lots. The Covenants define a lot as a "plot of land" and make no reference to the provision of electricity or telephone service as a part thereof. Moreover, there is no requirement that renters be provided electricity or telephone service. The lot owners are free to terminate electricity and telephone service at any time.

9. The other issues determined by the Court of Appeals are not challenged here and we express no opinion in this regard.