698 S.E.2d 773

**Blair MATHIS, Respondent,**

v.

**BROWN & BROWN OF SOUTH CAROLINA, INC., Appellant.**

**No. 26851.**

Supreme Court of South Carolina.

Heard March 16, 2010.
Decided Aug. 9, 2010.
Rehearing Denied Sept. 22, 2010.

300

302

Jeffrey A. Lehrer and S. Clay Keim, both of Ford & Harrison, of Spartanburg, for Appellant.

Robert M. Barrett, of Spartanburg, for Respondent.

John Green Creech, of Ogletree Deakins Nash Smoak & Stewart, of Greenville, for Amicus Curiae SC Chamber of Commerce.

Nikole Setzler Mergo, of Nexsen Pruet, of Columbia, for Amicus Curiae SC Hospital Association.

Justice PLEICONES.

This is an appeal from a trial court's order awarding damages under claims for breach of contract and violation of the Payment of Wages Act. Appellant Brown & Brown of South Carolina (Appellant) contends the trial court erred (1) in finding it breached its contract with Respondent Blair Mathis (Mathis); (2) in finding it violated the Payment of Wages Act; (3) in applying the Payment of Wages Act to prospective wages; (4) in failing to comply with Rule 52, SCRCP; and (5) in denying Appellant's motion for change of venue. We affirm on all issues with the exception of the trial court's holding that the Payment of Wages Act applies to prospective wages.

## FACTS

### A. Employment History

Mathis was employed as an account executive and producer for Reidman Insurance in Spartanburg, which was acquired by Appellant during Mathis's employment. In 2003, Mathis left employment with Appellant and went to work with a company that would later become Carolina First.

In 2004, Mathis received a call from an acquaintance, Herb McBride, the Profit Center Manager for Appellant's Greenville office. The two had lunch a number of times and began to discuss Mathis returning to work for Appellant. In August 2004, McBride verbally offered Mathis a salary of $90,000 per year for the first year of employment with Appellant, as well as a 20% commission on new business generated by Mathis. Additionally, Mathis would be assigned the $300,000 book of business of a departing producer and, in six months, would be named the Sales Manager. Mathis declined the offer.

McBride later laid out a new offer, which he then communicated in an e-mail (the McBride e-mail) which provided in part:

> This offer is from Hyatt Brown. The guaranteed salary for the first year is $110,000. You will be assigned the duties, responsibilities, and title of sales manager. Going forward I will assign, at least, $500,000 in coded existing business to comply with the 40/20 [commission structure] or apply the appropriate salary as a sales manager to insure that the

second year will be $120,000 earnings. As we discussed, if you are meeting your goals and achievements, doing your part, we will make sure we do our part and you are taken care [of] going forward. You will have an open expense account for customary expenses less than $100. Anything larger will require my approval.

Hyatt Brown was the CEO of Appellant's corporate office. Mathis testified that McBride explained that Hyatt Brown was involved through "corporate assistance," which meant that corporate headquarters was willing to pay part of Mathis's salary. After further negotiations, on September 17, 2004, Mathis accepted the offer and sent his resignation letter to Carolina First. Mathis began work on September 27, 2004. Two days later, he signed an Employment Agreement.

### B. Employment with Appellant

Mathis testified that he arrived for work one morning and found a blank copy of a corporate assistance form on his chair with a note from McBride saying that they needed to discuss the document. Mathis reviewed the document and noticed that it contained language providing for certain production goals and consequences for failing to meet the goals. According to Mathis, he objected to McBride that such contingencies were not part of his contract deal to which McBride responded that Mathis's salary would be unaffected by any failure to meet the goals.

In February 2005, McBride was replaced as Profit Center Manager by Clay Collins. Mathis testified that he met with Collins and brought his correspondence and employee records. Collins explained that he would not need a sales manager as he would be handling those duties himself. Mathis testified that he told Collins that he expected to have his job offer honored, to which Collins responded that he needed time to get acclimated to the new job and they would discuss the matter later.

In an e-mail in May 2005, Collins placed limits on expense accounts which were inconsistent with Mathis's agreement with McBride. In July 2005, Collins asked to meet with Mathis and informed him that, due to his failure to meet corporate assistance goals, he would reduce Mathis's salary to $90,000. According to Mathis, he told Collins that "it was

wrong" and that the two of them needed to speak with McBride, but Collins declined to do so. Mathis testified that he then turned to McBride who explained that he could not help Mathis. Beginning August 8, Appellant paid Mathis at the reduced salary.

In January 2006, Collins set new goals for Mathis for the coming year and warned that "[a]ny future short falls in new business and growth to your book will certainly have an impact on your compensation." Mathis responded with a letter in which he detailed his negotiations with McBride and the terms set forth in the e-mails from McBride. In a memo dated March 10, 2006, Collins again outlined payment reductions and extended a termination offer to Mathis. The memo provided, in part:

> In an email sent by Herb McBride (Profit Center Manager at the time) in September 2004, it was agreed that you would earn $110,000 in the first year and $120,000 in the second year of employment. In return for full cooperation with reasonable requests made by me, I am prepared to continue paying your current bi-weekly draw of $3,461.54 through March 31, 2006. During this time, you will be expected to meet with all current clients and future prospects currently in inventory in order to make full introductions to the new agent handling the account or myself as the Profit Center Manager. In return, I will provide you with a severance package totaling $16,124.86 which is equivalent to the pro-rata difference of $110,000 Year 1 and $120,000 Year 2 salaries that were originally agreed upon versus amounts paid through March 31, 2006.

Mathis did not respond to the offer and was terminated. Mathis then instituted this action.

## C. Procedural History

The trial court found a two-year contract of employment existed between the parties and that Appellant breached the terms of the contract by reducing Mathis's pay. The court further found that there was no bona fide dispute regarding the wages due Mathis and that Appellant violated the Payment of Wages Act by failing to pay Mathis the contract amount. Pursuant to the Payment of Wages Act, the trial court awarded Mathis three times the unpaid wages of his

two-year contract, plus attorney's fees. *See* S.C.Code Ann. § 41–10–80(C) (Supp.2005). The award was based on the difference between the reduced wages and the contractual compensation during the period Mathis remained employed, plus the wages he would have earned for the remaining term of the contract, less post-termination wages earned from other employment during that term. Appellant appealed, contesting a number of issues from the trial court.

## STANDARD OF REVIEW

 Actions seeking damages for breach of contract and actions for violation of the Payment of Wages Act are actions at law. *See McCall v. IKON,* 380 S.C. 649, 657, 670 S.E.2d 695, 700 (2008); *Ross v. Ligand Pharmaceuticals, Inc.,* 371 S.C. 464, 468, 639 S.E.2d 460, 462 (Ct.App.2006). In an action at law tried without a jury, the trial judge's findings have the force and effect of a jury verdict upon the issues and are conclusive on appeal when supported by competent evidence. *See Beheler v. Nat'l Grange Mut. Ins. Co.,* 252 S.C. 530, 535, 167 S.E.2d 436, 438 (1969). Accordingly, this Court's scope of review is limited to determining whether the findings are supported by competent evidence and correcting errors of law. *See Temple v. Tec–Fab, Inc.,* 381 S.C. 597, 600, 675 S.E.2d 414, 415 (2009).

## ISSUES

I. Did the trial court err in finding that Appellant breached its contract with Mathis?

II. Did the trial court err in finding that Appellant violated the Payment of Wages Act?

III. Did the trial court err in applying the Payment of Wages Act to prospective wages?

IV. Did the trial court order comply with Rule 52, SCRCP?

V. Did the trial court err in denying a change of venue?

## DISCUSSION

**I. Did the trial court err in finding that Appellant breached its contract with Mathis?**

Appellant does not dispute that a contract was created by the McBride e-mail, but instead contends that it did not

breach the contract for the following reasons: (1) the McBride e-mail did not establish a term contract but rather one of indefinite duration; (2) Mathis was employed "at will"; (3) even if the McBride e-mail established a term contract, Mathis was estopped from raising any claims for breach by continuing to work following the compensation change; and (4) the contract was voidable because it was induced by Mathis's misrepresentations as to the size of his business at Carolina First. We address each argument in turn.

A. *Did the trial court err in finding that the McBride e-mail established a term contract rather than one of indefinite duration?*

 Appellant contends that the McBride e-mail did not create a contract of definite term. Appellant therefore argues that it was free to reduce Mathis's pay without violating the contract. We find there is competent evidence to support the trial court's finding that the e-mail created a contract of definite term.

 Appellant correctly notes that " '[i]n order for a contract to be valid and enforceable, the parties must have a meeting of the minds as to all essential and material terms of the agreement.' " *Davis v. Greenwood Sch. Dist. 50*, 365 S.C. 629, 634, 620 S.E.2d 65, 67 (2005). Appellant argues that, "[a]t a minimum, there was no meeting of the minds regarding [Appellant's] right to terminate the employment relationship at-will":

The McBride e-mail makes it clear that Mathis['s] employment was of indefinite duration. It specifically stated, "As we discussed, if you are meeting your goals and achievements, doing your part, we will make sure we do our part and make sure you are taken care of going forward." Therefore, no definite term was established, but rather the employment period was intended by both parties to be indefinite.

The McBride e-mail provides, in relevant part, as follows: As we discussed, we at Brown & Brown are convinced that you are a big part of our future. This offer is from Hyatt Brown. The guaranteed salary for the first year is $110,000. You will be assigned the duties, responsibilities

and title of sales manager. Going forward, I will assign at least $500,000 in coded existing business to comply with the 40/20 or apply the appropriate salary as a sales manager to insure that the second year will be $120,000 earnings. As we discussed, if you are meeting your goals and achievements, doing your part, we will make sure we do our part and you are taken care of going forward.

We find that the plain language of the e-mail refutes Appellant's contention that "the employment period was intended by both parties to be indefinite" and that Appellant could terminate the relationship at-will. The e-mail specifically refers to two years of employment. The document guarantees Mathis one-year of employment at a salary of $110,000. It then provides that McBride will "insure that the second year will be $120,000 in earnings." These statements provide competent evidence to support the trial court's finding that the contract was a two-year contract. That the parties may or may not have chosen to continue their relationship beyond the two-year term does not render the contract one of indefinite duration. The vague language cited by Appellant that "if you are meeting your goals and achievements, doing your part, we will make sure we do our part and you are taken care of going forward" does not refute the language providing for, at minimum, two years of guaranteed employment. *See Moody v. McLellan,* 295 S.C. 157, 367 S.E.2d 449, 451 (Ct.App.1988) (courts must interpret contracts based on their plain language). Moreover, even if the language creates an ambiguity, a court will construe any doubts and ambiguities in an agreement against the drafter of the agreement. *See Duncan v. Little,* 384 S.C. 420, 425, 682 S.E.2d 788, 790 (2009).

### B. Did the trial court err in finding that Mathis was not employed "at-will"?

Appellant contends that overwhelming evidence demonstrates that Mathis was employed "at-will" and, consequently, the trial court erred in finding that the contract between Mathis and Appellant was a term contract. We disagree.

In South Carolina, employment at-will is presumed absent the creation of a specific contract of employment. *See Prescott v. Farmers Tel. Coop.,* 335 S.C. 330, 334–36, 516

S.E.2d 923, 925–26 (1999). An at-will employee may be terminated at any time for any reason or for no reason, with or without cause. *See Hessenthaler v. Tri–County Sister Help, Inc.*, 365 S.C. 101, 107, 616 S.E.2d 694, 697 (2005).

Appellant argues that while Mathis may have initially been party to a term contract, by signing the Employment Agreement, he became an at-will employee. Appellant cites to the case of *Cape v. Greenville County Sch. Dist.*, 365 S.C. 316, 618 S.E.2d 881 (2005), for the proposition that a term contract may be altered to at-will. 365 S.C. at 319, 618 S.E.2d at 883. We find that *Cape* is not applicable here.

In *Cape*, a teacher signed a contract for a specific school year which contained a provision specifying that the contract was for at-will employment. *Id.* at 317, 618 S.E.2d at 882. This Court noted that a contract for a definite term "is presumptively terminable only upon just cause" but found that the parties had "by express contract provision, altered *the presumption* that employment for a definite term is terminable only upon just cause, and replaced that presumption with an at-will termination clause." *Id.* (emphasis added). The instant case is markedly different than *Cape* as the email which formed the basis for the contract did not contain an at-will clause, and instead only referenced the definite term.

Moreover, the document which Appellant contends converted the contract from a term contract to an at-will contract was signed *after* the contract was created. Any subsequent agreement must be supported by consideration and Appellant has shown no separate consideration to support the Employment Agreement. *See Poole v. Incentives Unlimited, Inc.*, 345 S.C. 378, 548 S.E.2d 207 (2001) (holding that when a covenant is entered into after the inception of employment, separate consideration, in addition to continued employment, is necessary in order for the covenant to be enforceable).

Appellant further contends that "Mathis was aware from the outset of his discussions about the possibility of working for [Appellant] . . . that his employment would be at-will and governed by [Appellant's] Employment Agreement." However, the portions of the record cited by Appellant do not support this contention. Mathis admits that, based on his past employment with Appellant, he expected that he would have to

sign an Employment Agreement, which he referred to as a "non-piracy" agreement. However, while Mathis testified that he expected certain non-compete clauses to be part of the Employment Agreement, Appellant did not demonstrate that Mathis knew that the Employment Agreement specified at-will employment.

Given the above, we find competent evidence supports the trial court's finding that the contract between Appellant and Mathis was a term contract rather than an at-will contract.

C. *Did the trial court err in finding that Appellant breached its contract with Mathis where Appellant had a reasonable good faith belief that it had "cause" to terminate Mathis?*

Appellant argues that even if its contract with Mathis was a term contract and, consequently, could only be terminated "for cause," Appellant had a reasonable good faith belief that it had "cause" to terminate Mathis. Consequently, in Appellant's view, it did not breach the contract by reducing Mathis's salary or discharging him and the trial court erred in finding to the contrary. We find that this issue is not properly preserved for our review.

In order for an issue to be properly preserved for appeal, it must have been both raised to and ruled on by the trial court. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000). The trial court's order did not address Appellant's argument that it had "cause" to terminate Mathis's contract. Appellant's Motion to Alter or Amend did not bring the absence of this issue to the trial court's attention. Accordingly, this issue is not preserved.

D. *Did the trial court err in finding that Mathis was not estopped from raising his claims by continuing to work following the compensation change?*

Appellant argues that even if the McBride e-mail established a term contract, the trial court erred in finding that it breached the contract as Mathis was estopped from

raising claims regarding the change in compensation by continuing to work for Appellant. We disagree.[1]

As noted above, Collins informed Mathis of the compensation change in writing in a letter dated August 1, 2005. According to Mathis, Collins verbally notified him of the change during a meeting on July 18, 2005. Mathis testified that he objected to the change and asked that they discuss the matter with McBride, which Collins declined to do. Mathis then claimed that he raised the issue with McBride and presented Collins with McBride's initial offer, explaining that he had declined the offer and instead accepted a two-year guarantee. Months later, in response to a letter from Collins referencing Mathis's agreement with McBride, Mathis sent a letter to Collins detailing his negotiations with McBride and the e-mail offers.

Appellant claims that because Mathis continued to work for Appellant in the months following the change in compensation, he is estopped from raising contract and wage claims. In support of its argument, Appellant cites *Facelli v. Southeast Mktg. Co.*, 284 S.C. 449, 327 S.E.2d 338 (1985). In *Facelli*, this Court found that an employee who continued to work for his employer for six months without complaint following a change to his commission rate impliedly consented to the change. *Id.* at 452, 327 S.E.2d at 339. Consequently, the employee was estopped from seeking damages for the change. *Id.*

Mathis argues that *Facelli* is distinguishable from the instant case because, unlike the employee in *Facelli*, Mathis objected to the compensation change. Two cases from the Court of Appeals are instructive on this point and reach different conclusions on the issue. In *Matthews v. City of Greenwood*, 305 S.C. 267, 407 S.E.2d 668 (Ct.App.1991), the Court of Appeals relied on *Facelli* in upholding a circuit court's ruling granting summary judgment on an employee's claim based on a unilateral change in his original employment

---

1. Though Appellant uses the term "waiver," Appellant actually argued to the trial court and argues in its brief to this Court that Mathis is barred from recovering for the compensation change under the doctrine of estoppel. Case law cited by Appellant at the trial court and on appeal holds that an employee may be barred recovery for a reduction in salary based on estoppel.

contract. *Id.* at 270–71, 407 S.E.2d at 669–670. The City initially agreed to provide the employee with a car for personal and business use, but then gave the employee notice of a new policy which prohibited personal use of city vehicles. *Id.* at 270, 407 S.E.2d at 669. Despite the fact that Matthews protested the change, the Court of Appeals found that by continuing to work for approximately seven years after the change, he was estopped from seeking damages. *Id.* at 271, 407 S.E.2d at 670.

The Court of Appeals reached a different conclusion in *Estes v. Roper Temp. Servs.*, 304 S.C. 120, 403 S.E.2d 157 (Ct.App.1991). *Estes* involved an employee whose written employment contract was unilaterally altered by her employer. *Id.* at 121, 403 S.E.2d at 158. The Court of Appeals noted that the employee "did not agree to these changes and, indeed, objected to them while continuing to work" and it found that the trial court erred in finding the employee estopped from asserting the breach of contract action. *Id.* at 122, 403 S.E.2d at 158.

The *Estes* court noted that the employer, as the party seeking estoppel, was required to prove the elements of estoppel, including that the employee "engaged in conduct that amounted to a false misrepresentation or concealment." *Id.*, citing *Frady v. Smith*, 247 S.C. 353, 359, 147 S.E.2d 412, 415 (1966) (the party estopped must have made a false misrepresentation or concealment or made some representation calculated to convey an incorrect impression of the facts), *overruled on other grounds by Tolemac, Inc. v. United Trading, Inc.*, 326 S.C. 103, 484 S.E.2d 593 (1997). The court continued:

> The trial court, relying upon [*Facelli* ] found Estes made a false representation by continuing to work and receive compensation. In *Facelli*, the Supreme Court held that an employee's continuing to work and accept compensation, without either objecting to or complaining about a change in compensation, constitutes a representation that the employee impliedly consents to the employer's unilateral change in compensation. The trial court, however, ignored the fact that in this instance the employee objected to the change in compensation. This circumstance alone distinguishes the case here from *Facelli*. More importantly, it creates a genuine issue of material fact as to whether Estes consented

to the change in compensation and thus renders summary judgment inappropriate.

*Estes,* 304 S.C. at 122, 403 S.E.2d at 158.

We are most persuaded by *Estes,* as we find it to be more relevant factually and that it best comports with the doctrine of estoppel. *See* Black's Law Dictionary 589 (8th ed.2004) (defining estoppel, in part, as: "A bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true."). We therefore hold that, on these facts, there was a genuine issue of material fact whether Mathis consented to the compensation reduction by continuing employment with Appellant. We find competent evidence to support the trial court's finding that Mathis did not impliedly consent by continuing to work following the reduction in pay.

> *E. Did the trial court err in finding that the contract was not voidable because it was induced by Mathis's misrepresentation?*

■■■ Appellant contends the trial court erred in finding it breached its contract with Mathis because the contract was induced by Mathis's misrepresentations regarding his book of business at Carolina First and is therefore voidable. We disagree.

■■■ A contract may be rescinded for mistake, if justice so requires, where the mistake is unilateral and has been induced by the fraud, deceit, misrepresentation, concealment, or imposition of the party opposed to the rescission, without negligence on the part of the party claiming rescission. *See King v. Oxford,* 282 S.C. 307, 313, 318 S.E.2d 125, 128 (Ct.App.1984), citing *Jumper v. Queen Mab Lumber Co.,* 115 S.C. 452, 106 S.E. 473 (1921). We find there is conflicting evidence whether Mathis made misrepresentations to Appellant. Clearly, the trial judge made a credibility determination in favor of Mathis. We find that the trial court's determination is supported by competent evidence and he did not err in failing to find the contract voidable based on misrepresentation. *See Pinckney v. Warren,* 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001) (scope of review does not require appellate court to disregard find-

ings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses).

## II. Did the trial court err in finding that Appellant violated the Payment of Wages Act?

As noted, the trial court found that Appellant withheld wages from Mathis though there was no bona fide dispute as to wages due. The court therefore found that Appellant violated the Payment of Wages Act and awarded Mathis an amount equal to three times the unpaid wages, plus costs and attorney's fees. Appellant contends that the trial court erred in finding that it violated the Payment of Wages Act because (1) there was a bona fide dispute as to wages due Mathis, and (2) Appellant provided seven days notice prior to the compensation change as required under the Payment of Wages Act.

### A. Bona fide dispute

Appellant argues that the trial court erred in ruling that Appellant did not have any bona fide dispute to Respondent's contract and Payment of Wages Act claims. We disagree.

S.C.Code Ann. § 41–10–40 generally requires an employer to timely pay all wages due and § 41–10–50 provides that when an employer discharges an employee, it must timely pay him all wages due. S.C.Code Ann. §§ 41–10–40, 50 (Supp. 2005). S.C.Code Ann. § 41–10–80(C) provides that when an employer violates the provisions of §§ 41–10–40 or 41–10–50 "the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow." S.C.Code Ann. § 41–10–80(C) (Supp.2005). However, this Court held in *Rice v. Multimedia, Inc.*, 318 S.C. 95, 456 S.E.2d 381 (1995), that the penalty set forth in § 41–10–80(C) is discretionary with the trial judge. 318 S.C. at 98, 456 S.E.2d at 383. The Court reasoned that "[t]he imposition of treble damages in those cases where there is a bona fide dispute would be unjust and harsh." *Id.*

▆ Appellant contends that "[t]o warrant reversal, [Brown & Brown] need only establish that one of the following defenses constitutes a bona fide defense or good faith dispute" and then lists each of the arguments set forth in its brief.

However, the relevant date for determining whether the employer reasonably withheld wages is the time at which the wages were withheld, i.e., when the employer allegedly violated the Act. *See Rice,* 318 S.C. at 99, 456 S.E.2d at 383 (in enacting the Payment of Wages Act, "the legislature intended to punish the employer who forces the employee to resort to the court in an unreasonable or bad faith wage dispute."). The question before this Court, therefore, is whether, at the time that Appellant reduced Mathis's compensation, it had a reasonable good faith reason for doing so. Consequently, Appellant's arguments that it reasonably believed that the agreed-upon compensation was not owed Mathis due to (1) his waiver by continuing to work after the change; and (2) alleged violations of the non-piracy provisions cannot justify the decision to reduce Mathis's guaranteed salary.[2]

We have addressed Appellant's remaining arguments above and we find competent evidence supports the trial court's finding that no bona fide dispute existed to support Appellant's decision.

### B. Required Notice

■■■ Appellant also contends that the trial court erred in finding that it violated the Payment of Wages Act because it complied with the Act by providing Mathis with seven days notice prior to the compensation change, in accordance with S.C.Code Ann. § 41–10–30. We disagree.

S.C.Code Ann. § 41–10–30 requires, in part:

Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs. The employer has the option of giving written notification by posting the terms conspicuously at or near the place of work. Any changes in these terms must be made in writing at least seven calendar days before they

---

2. These points could be relevant to show that a bona fide dispute existed regarding Appellant's failure to pay Mathis's future wages, but we need not address this contention as we find below that the Payment of Wages Act does not apply to future wages.

become effective. This section does not apply to wage increases.

S.C.Code Ann. § 41–10–30(A) (Supp.2005). Appellant notes that, in a letter dated August 1, Clay Collins informed Mathis of the reduction in salary effective August 8. Consequently, in Appellant's view, "[b]y giving Mathis seven-days written notice of the change in his compensation structure, [Brown & Brown] fully complied with the Payment of Wages Act regardless of the Trial Court's ruling regarding Mathis's contract claim."

 Even assuming that Appellant has complied with the requirements of § 41–10–30(A), this alone does not show full compliance with the Payment of Wages Act. S.C.Code Ann. § 41–10–40(C) provides: "An employer shall not withhold or divert any portion of an employee's wages unless the employer is required or permitted to do so by state or federal law or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of § 41–10–30." Appellant cannot comply with § 41–10–40(C) merely by giving notice, as the latter half of the statute applies only to "deductions." In altering Mathis's salary, Appellant's action constituted a *reduction* rather than a *deduction.* A "deduction" within the terms of the statute, is the act of taking away from a salary in order to fund some benefit. This is how the term is used in the context of § 41–10–30(A): "Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, *and the deductions which will be made from the wages, including payments to insurance programs.*" S.C.Code Ann. § 41–10–30(A) (Supp.2005) (emphasis added). This reading better comports with the purpose of the Payment of Wages Act, which is "to protect employees from the unjustified and willful retention of wages by the employer." *Rice,* 318 S.C. at 98, 456 S.E.2d at 383.

Under this interpretation, Appellant cannot comply with the Payment of Wages Act, while breaching the contract, simply by providing seven days notice of the breach. Consequently, even assuming that Appellant gave notice, we find competent evidence to support the trial court's finding that Appellant violated the Act.

**III. Did the trial court err in finding the Payment of Wages Act applies to prospective wages?**

 Appellant contends that the trial court erred in awarding Mathis damages for prospective wages under the Payment of Wages Act.[3] We agree.

As noted above, this Court has held that the purpose of the Payment of Wages Act is "to protect employees from the unjustified and willful retention of wages by the employer." *Rice,* 318 S.C. at 98, 456 S.E.2d at 383. The Act itself defines the term "wages" as follows:

> "Wages" means all amounts at which *labor rendered* is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are *due* to an employee under any employer policy or employment contract. Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.

S.C.Code Ann. § 41–10–10(2) (Supp.2009) (emphasis added). The past tense of the word "rendered" suggests services provided in the past. The word "recompensed" too suggests that payment is for labor already completed. *See* Webster's Third New Int'l Dictionary 1897 (2002) (defining "recompensed" in part, as "an equivalent or a return for something done, suffered, or given"). Other sections of the Payment of Wages Act speak of acts done in the past. *See, e.g.*, S.C.Code Ann. §§ 41–10–40(D) ("Every employer in the State shall pay *all wages due* at the time and place designated...."); 41–10–50 ("When an employer separates an employee from the payroll ... the employer shall pay *all wages due*...."); 41–10–80(C) ("In case of any failure to pay *wages due* to an employee...."). The word "due" means "owed or owing as a debt" and, as wages are defined by the Act as amounts paid for labor rendered, no wages can be due for future services. *See* Webster's Third New Int'l Dictionary 699 (2002). Based on the plain language of the statutes in the Payment of Wages Act, the Act does not apply to prospective wages. *See Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where

---

3. The South Carolina Hospital Association and the South Carolina Chamber of Commerce submitted amicus briefs on this issue.

the statute's language is plain and unambiguous and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning.").

A majority of other jurisdictions addressing this issue have interpreted similar statutes as applying only to services rendered in the past.[4] North Carolina courts have found that future unearned wages are not "wages" for purposes of its Wage and Hour Act, which contains a definition of "wage" similar to the definition of "wages" found in the South Carolina Act. *See, e.g., Narron v. Hardee's Food Sys.,* 75 N.C.App. 579, 583, 331 S.E.2d 205, 208 (N.C.Ct.App.1985), *overruled on other grounds* ("the Wage and Hour Act requires an employer ... to pay those wages and benefits due when the employee has actually performed the work required to earn them.").

In support of his argument that the Payment of Wages Act applies to future wages, Mathis cites to a case from the Louisiana Court of Appeals, *Saacks v. Mohawk Carpet Corp.,* 855 So.2d 359 (La.Ct.App.2003). In *Saacks,* the Louisiana court found that amounts owed under a fixed-term contract constituted "wages" under a Louisiana statutory scheme similar to the Payment of Wages Act. We do not find *Saacks* persuasive as the case contains little discussion of the past wages versus future wages issue and espouses a view which it appears has not been adopted by any other jurisdiction. We find persuasive the argument advanced by the amici, that while "prospective" or "post-termination" earnings may be awarded as damages for breach of contract, they do not constitute "wages."

We find the trial court erred in finding the Payment of Wages Act applied to future wages. Accordingly, the treble damages award should be reduced from $127,199.94 to $46,073.25.[5]

---

4. *See, e.g., Martin v. Pomeroy Computer Res., Inc.,* 87 F.Supp.2d 496 (W.D.N.C.1999); *Lee v. Great Empire Broad., Inc.,* 794 P.2d 1032 (Colo.Ct.App.1989); *City of Clinton v. Goldner,* 885 N.E.2d 67 (Ind.Ct. App.2008); *Battaglia v. Clinical Perfusionists, Inc.,* 338 Md. 352, 658 A.2d 680 (Md.Ct.Spec.App.1995).

5. Mathis agreed that the difference between what he was paid by Appellant and what he should have been paid under his guaranteed

## IV. Did the trial court's order comply with Rule 52, SCRCP?

Appellant argues that the trial court's order lacks findings of fact and does not address Appellant's defenses specifically and is therefore not in compliance with Rule 52, SCRCP. We disagree.

Rule 52, SCRCP provides that "[i]n all actions tried upon the facts without a jury ... the court shall find facts specially and state separately its conclusions of law thereon...." Rule 52, SCRCP. This Court has held that this rule "is directorial in nature so where a trial court substantially complies with Rule 52(a) and adequately states the basis for the result it reaches, the appellate court should not vacate the trial court's judgment for lack of an explicit or specific factual finding." *In re Treatment and Care of Luckabaugh*, 351 S.C. 122, 131, 568 S.E.2d 338, 342 (2002), citing *Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 123 (1991). The requirement for appropriately detailed findings "is designed ... to dispose of the issues raised by the pleadings and to allow the appellate courts to perform their proper function in the judicial system." *Id.* at 132, 568 S.E.2d at 343, citing *Coble v. Coble*, 300 N.C. 708, 712, 268 S.E.2d 185, 189 (N.C. 1980). A lower court is not required to set out findings on all the myriad factual questions arising in a particular case, but the findings must be sufficient to allow this Court, sitting in its appellate capacity, to ensure the law is faithfully executed below. *Id.*

We find the trial court's four-page order complies with Rule 52(a). The order expressly addressed the existence of a valid employment contract, the terms of the contract, breach of the contract, mitigation, Mathis's damages, and the applicability of the Payment of Wages Act. The trial court also specifically found no bona fide dispute as to the wages owed and that Mathis did not waive his claims. The order is sufficient to allow this Court to perform its role of appellate review.

---

salary is $15,357.75. This amount trebled is $46,073.25. Mathis is also entitled to receive an additional $27,042.23 as post-termination breach of contract wages.

## V. Did the trial court err in denying the motion to change venue?

Appellant argues that the trial court erred in denying its motion to change venue from Spartanburg to Greenville County. We disagree.

A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent a manifest abuse of discretion. *See McKissick v. J.F. Cleckley & Co.*, 325 S.C. 327, 335, 479 S.E.2d 67, 71 (Ct.App.1996). South Carolina's venue statute provides that "[a] civil action tried pursuant to this section against a domestic corporation . . . must be brought and tried in the county in which the: (1) corporation . . . has its principal place of business at the time the cause of action arose; or (2) most substantial part of the alleged act or omission giving rise to the cause of action occurred." Appellant is a domestic corporation with offices in Charleston, Greenville, and Spartanburg counties. Appellant does not have a principal place of business in South Carolina [6], but its largest office is in Greenville.

Appellant contends that the most substantial part of the alleged act or omission giving rise to the cause of action occurred in Greenville County, where Mathis maintained his office, and therefore Greenville is the appropriate venue. Mathis counters that venue in Spartanburg is appropriate because Appellant maintains an office in Spartanburg and actively recruited Mathis, a Spartanburg resident, for employment.

In denying Appellant's motion to transfer venue, the trial court noted that "the central issue to the case is going to be the contract or the existence of the contract. . . . Furthermore, from the attachments to the Complaint, it appears that Spartanburg is the primary county for purposes of the contract and, thus, venue can be considered proper. . . ." We do not

---

6. Appellant argues in its Reply Brief that its principal place of business is in Greenville County. Appellant did not make this argument in its Motion to Change Venue and Clay Collins's affidavit, which it submitted to the trial court, provides that Appellant does not have a principal place of business in the State. Consequently, Appellant may not argue that its principal place of business is in Greenville. *See I'On, L.L.C.*, 338 S.C. at 422, 526 S.E.2d at 724.

believe Appellant has shown the trial judge committed a manifest abuse of discretion in denying its motion to transfer venue.[7]

## CONCLUSION

For the reasons stated above, we affirm that portion of the trial court's order finding that Appellant breached its contract with Mathis but reverse that portion awarding damages for prospective wages under the Payment of Wages Act. We therefore remand the matter to the circuit court for calculation of damages consistent with this opinion, which should not include damages for prospective wages under the Payment of Wages Act.

TOAL, C.J., BEATTY, KITTREDGE and HEARN, JJ., concur.

---

7. Additionally, we note Appellant does not allege that it was harmed by the trial court's refusal to change venue, especially given the fact that the case was tried without a jury, at its specific insistence.