772 S.E.2d 528

R.C. Frederick HANOLD, III and Rose F. Hanold, and Carol R. Mitchell and George P. Mitchell, Jr., Respondents,

v.

WATSON'S ORCHARD PROPERTY OWNERS ASSOCIATION, INC., a South Carolina Corporation, Pelham Farm, LLC, a South Carolina Corporation, Legacy One, LLC, a South Carolina Corporation, SESP, LLC, a South Carolina Corporation, an unknown Trustee of the Revocable Trust Agreement Dated March 19, 1996, established by James B. Stephens as amended, and unknown Jay Stephens and Mike Stephens as Co–Personal Representative of the Estate of James B. Stephens, Defendants,

Of whom Pelham Farm, LLC, a South Carolina Corporation, Legacy One, LLC, a South Carolina Corporation, an unknown Trustee of the Revocable Trust Agreement Dated March 19, 1996, established by James B. Stephens as amended, and unknown Jay Stephens and Mike Stephens as Co–Personal Representative of the Estate of James B. Stephens, are the, Appellants.

v.

Property Owners in Watson's Orchard Subdivision: N. Carter Poe, III; McNally Reeves, as Trustee of the Residual Trust under Item Five of the Last Will and Testament of Hattie L. Reeves dated February 9, 1998; Janet B. Yusi; Lucy S. Tiller; James G. Stephens; Rachel P. McKaughan; Ramon J. Ashy and Jana Ashy; Christopher D. Scalzo and Heather V. Scalzo; Erma R. Rash, as Trustee of the Erma R. Rash Revocable Trust dated February 12, 2010; James Edwin Conrad, as Trustee of the James Edwin Conrad Living Trust dated September 7, 2010; Sue Lane Conrad; Horst H.H. Eschenberg and Floride C. Eschenberg; Caryl L. Clover, as Trustee of the Caryl L. Clover Revocable Living Trust Agreement dated May 12, 1999; Mary F. Newell; Timothy M. Conroy and Elizabeth W. Conroy;

388

Nathan Scolari; Joel Wells Norwood and Lynn Norwood; J. Lynn Shook; Juan Hernandez and Janice M. Pelletier; Scott P. Payne and Kathleen H. Payne; Joe G. Thomason and Dana L. Henry Thomason; Traci Segura; Cameron E. Smith and Joan B. Smith; Charles E. Howard and Sharon F. Howard; Penelope J. Galbraith; Meredith C. Vry; Delores B. Mitchell; Lisette M. Silva and Mary F. Colley; Ilona K. Alford and William G. Alford; George T. McLeod and Martha T. McLeod; Ronald S. Wilson and Robin E. Wilson; The Merrill J. Gildersleeve and Anore L. Novak Revocable Living Trust dated November 1, 1996; Anna Marie T. Azores and Kim O. Gococo; Ashley Westrope as Trustee of Martha Randolph Westrop Trust dated June 6, 1988; Cliff C. Jollie and Martha W. Jollie; David A. Saliny and Xiaoli Saliny; Lecia S. Franklin; Dean D. Varner and Deborah P. Varner; W. Frank Durham, Jr.; Christine M. Howard; Samuel P. Howard, Jr. and Jane H. Howard; Manfred E. Kramer and Jane J. Kramer; Mary J. Steele; James J. Barrett, III and Kimberly A. Barrett; Richard A. Herman and Patricia L. Herrman, Third–Party Defendants.

Appellate Case No. 2013–000452.
Nos. 5312, 2013–000452.

Court of Appeals of South Carolina.

Heard Nov. 4, 2014.
Decided April 15, 2015.
Rehearing Denied June 19, 2015.

390

William D. Herlong, of The Herlong Law Firm, LLC, of Greenville, for Appellants.

Randall Scott Hiller, of Greenville, for Respondents.

WILLIAMS, J.

Pelham Farm, LLC; Legacy One, LLC; an unknown trustee of the revocable trust agreement established by James B. Stephens; and Jay Stephens and Mike Stephens, as co-personal representatives of the estate of James B. Stephens (collectively Appellants [1]) contend the circuit court erred in

---

1. Watson's Orchard Property Owners Association, Inc. (WOPOA) was a defendant in the declaratory judgment action but did not appeal the underlying decision.

finding their amendment to a restrictive covenant that governed the development of property in Greenville County, South Carolina, was invalid for lack of a majority vote. We affirm.

## FACTS

In the 1960s, Richard Watson and his wife began developing their substantial landholdings that stretched from present-day I–385 up to and across the north and south side of Pelham Road in Greenville, South Carolina. Prior to this time, Watson's land was used as an orchard. Once development began, restrictions were placed on the entire property[2] to limit its development to single family residential use. Subsequently, a subdivision plat was recorded that created forty-seven lots in what is currently known as Watson's Orchard Subdivision.[3] Thereafter, these lots were developed into upscale homes.

In 1979, Watson recognized that his property south of Pelham Road could realize a greater value if developed commercially. As a result, he sold the vast majority of his property on the south side of Pelham Road to Lincoln of South Carolina, Inc. (Lincoln). Lincoln then entered into negotiations with the owners of the lots in Watson's Orchard Subdivision to obtain a release of the residential use restrictions for Watson's property south of Pelham Road. These negotiations resulted in the property owners, with the exception of J.B. Stephens, agreeing to release the restrictions in exchange for the transfer of a twenty-two acre buffer zone on the south side of Pelham Road, that was to be sold and developed as single family residential lots.

As part of the agreement, the property in the buffer zone was to be owned by Watson's Orchard Property Owners Association, Inc. (WOPOA), a for profit corporation tasked with the responsibility of developing and selling the lots within the buffer zone. The stock in WOPOA was granted to the

---

**2.** In January 1962, the Watsons recorded a preliminary protective covenant that applied to the property on both the north and south side of Pelham Road.

**3.** In September 1964, after the forty-seven lots were platted and approved, additional restrictions and protective covenants were recorded specifically for Watson's Orchard Subdivision, all of which are still in effect today.

owners of Watson's Orchard Subdivision who would ultimately benefit financially from the sale of the lots within the twenty-two acres.

In 1981, Lincoln, as the declarant, imposed the Restrictions and Covenants (1981 R & Cs), which are the subject of this action, upon the twenty-two acre buffer zone. Thereafter, Lincoln conveyed the twenty-two acre tract of land to WOP-OA. Although J.B. Stephens did not have any stock in WOPOA, in exchange for his cooperation to release the residential use restrictions, Stephens purchased six acres on the south side of Pelham Road (the Property) directly across from Watson's Orchard Subdivision from WOPOA. This six-acre tract contained sufficient property to allow it to be developed into five residential lots. The successors to J.B. Stephens are the appellants in this action.

The 1981 R & Cs included a provision requiring a majority vote of the current property owners of Watson's Orchard Subdivision, as well as the owners of the lots in the buffer zone, to change or amend the 1981 R & Cs. The pertinent provision states the following:

[T]he covenants, conditions[,] and restrictions hereinafter set forth shall run with the property ... and be binding upon all parties having any right, title or interest in the said described properties ... until January 1, 2010[,] at which time said covenants, conditions, and restrictions shall be automatically extended for successive periods of ten (10) years each unless, *by vote of a majority of the then owners of the lots into which the property described above shall have been developed and in Watson's Orchard Subdivision,* the within covenants, conditions[,] and restrictions are changed or amended, in whole or in part.

(emphasis added). In 2005, J.B. Stephens attempted to purchase the remainder of the property in the buffer zone owned by WOPOA for over two million dollars. The transaction was never consummated, but Respondents contend it spurred Appellants' efforts to amend the 1981 R & Cs, which prompted the present litigation.

Several months prior to the January 1, 2010 date listed in the 1981 R & Cs, Appellants attempted to amend the 1981 R & Cs to remove the residential development requirement for

the property that abuts J.B. Stephens' acreage south of Pelham Road. Appellants obtained twenty-nine of fifty-four possible votes[4] in favor of amending the 1981 R & Cs, and then filed the amended Restrictions and Covenants (2009 R & Cs) in the Greenville County Register of Deeds Office on November 9, 2009. Of the necessary twenty-nine votes, Appellants asserted they possessed five votes based on the five "lots" within the six acres purchased by J.B. Stephens in 1981.

Homeowners R.C. Frederick Hanold III, Rose Hanold, Carol Mitchell, and George Mitchell Jr., (Respondents) filed suit on September 8, 2009, seeking a declaratory judgment that the 2009 R & Cs were not validly adopted. WOPOA and Appellants answered and counterclaimed for a declaratory judgment that the 2009 R & Cs were valid. WOPOA and Appellants filed an amended answer, adding the property owners in WOPOA as third-party defendants. The property owners did not respond and default judgment was entered against them. WOPOA, Appellants, and Respondents then filed cross motions for summary judgment on April 27, 2012, and the circuit court denied both motions, finding genuine issues of material fact existed and, thus, summary judgment was inappropriate.

The circuit court received testimony and evidence from both parties on September 4 and 5, 2012, in the declaratory judgment action. In its order finding for Respondents, the circuit court concluded the Property had "not been developed into lots for the purpose of being entitled to vote to amend or modify the restrictive covenants." The circuit court concluded the plain and unambiguous language of the 1981 R & Cs required the lots be developed prior to being eligible to vote. The court cited the following in support of its conclusion: (1) Appellants failed to demonstrate a plat was ever prepared or recorded as required by Greenville County ordinance, which was a prerequisite to subdividing or offering a lot for sale; (2) the Property possessed a single tax map number, preventing it from being legally sold as five individual lots on the date of

---

4. Respondents contend the number of votes allotted to J.B. Stephens was directly correlated to how many favorable votes the board of WOPOA needed to remove the restrictions, citing to a document in which the board postulated different ways to count J.B. Stephens' votes to obtain a majority vote.

the purported amendment; and (3) the 1981 deed of sale and other supporting documents offered to demonstrate the six-acre tract was comprised of five separate lots only showed the intent of the parties to the conveyance, not the intent of Lincoln, which is paramount in interpreting a restrictive covenant. The court then ruled the amendment to the 1981 R & Cs and subsequent recording of the 2009 R & Cs were both void and of no force and effect. This appeal followed.

## STANDARD OF REVIEW

■ "Declaratory judgments in and of themselves are neither legal nor equitable." *Campbell v. Marion Cnty. Hosp. Dist.*, 354 S.C. 274, 279, 580 S.E.2d 163, 165 (Ct.App.2003). "The standard of review for a declaratory judgment action is therefore determined by the nature of the underlying issue." *Id.*

■ "Restrictive covenants are contractual in nature." *Hardy v. Aiken*, 369 S.C. 160, 166, 631 S.E.2d 539, 542 (2006). An action to enforce restrictive covenants by means of injunctive relief, however, is an action in equity. *Cedar Cove Homeowners Ass'n v. DiPietro*, 368 S.C. 254, 258, 628 S.E.2d 284, 286 (Ct.App.2006). In an equitable action, we may find the facts in accordance with our own view of the evidence. *Id.* "While this standard permits a broad scope of review, an appellate court will not disregard the findings of the [circuit] court, which saw and heard the witnesses and was in a better position to evaluate their credibility." *Buffington v. T.O.E. Enters.*, 383 S.C. 388, 391, 680 S.E.2d 289, 290 (2009).

■ In this case, Respondents requested the circuit court enjoin and restrain Appellants from using the property in any manner inconsistent with the 1981 R & Cs. The circuit court, in declaring the amendment to the 2009 R & Cs invalid, effectively enjoined Respondents from developing the property in any manner inconsistent with the 1981 R & Cs. Accordingly, this action sounds in equity, and we may review the circuit court's factual findings in accordance with our own view of the preponderance of the evidence. *See Cullen v. McNeal*, 390 S.C. 470, 481, 702 S.E.2d 378, 384 (Ct.App.2010).

## LAW/ANALYSIS

Appellants claim the circuit court failed to consider overwhelming evidence in their favor when it declared the 1981 R & Cs were improperly amended. Specifically, Appellants contend the circuit court erred in (1) ignoring documentary evidence, lay witness testimony, and expert testimony that overwhelmingly established the Property was comprised of five lots; (2) improperly relying on state and local law when it concluded Appellants were required to record the plat of the Property as a prerequisite to subdividing the Property into lots; and (3) failing to consider the text of the 1981 R & Cs as well as the drafter's intentions when it concluded the Property was not developed into lots. We address each argument in turn.

## I. Documentary Evidence & Lay and Expert Testimony

Appellants first contend the overwhelming evidence demonstrated the Property was comprised of five developed lots, thus entitling Appellants to five votes pursuant to the 1981 R & Cs. Because we hold the Property does not satisfy the plain and ordinary meaning of "lots which shall have been developed," we affirm the circuit court and find it properly declined to consider this evidence.

 "[A] restriction on the use of the property must be created in express terms or by plain and unmistakable implication, and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property." *Hardy*, 369 S.C. at 166, 631 S.E.2d at 542 (alteration in original). "The language of a restrictive covenant is to be construed according to the plain and ordinary meaning attributed to it at the time of execution." *Id.* "[T]he paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document." *Taylor v. Lindsey*, 332 S.C. 1, 4, 498 S.E.2d 862, 863–64 (1998) (internal quotation marks and citation omitted). "When the language of a contract is clear, explicit, and unambiguous, the language of the contract alone determines the contract's force and effect. . . ." *Moser v. Gosnell*, 334 S.C. 425, 430, 513 S.E.2d 123, 125 (Ct.App.1999) (citation omitted). To that end, when the language creating restrictions on the use of property

is unambiguous, the restrictions will be enforced according to their plain and obvious meaning. *Shipyard Prop. Owners' Ass'n v. Mangiaracina,* 307 S.C. 299, 308, 414 S.E.2d 795, 801 (Ct.App.1992).

We find the plain language of the 1981 R & Cs only afforded a property owner voting rights for developed lots. The term "developed" is not defined in the 1981 R & Cs. However, resort to its usual and customary definition leads us to the conclusion that the Property was not developed into lots as required by the 1981 R & Cs. *See Anderson v. Buonforte,* 365 S.C. 482, 490, 617 S.E.2d 750, 754 (Ct.App.2005) ("When a term is not defined within a contract, evidence of its usual and customary meaning is competent to aid in determining its meaning."); *Strother v. Lexington Cnty. Recreation Comm'n,* 332 S.C. 54, 62, 504 S.E.2d 117, 122 (1998) (holding when faced with an undefined term, the court must interpret the term in accord with its usual and customary meaning).

South Carolina courts have not expressly defined the term "developed" in the context of restrictive covenants pertaining to landholdings. However, cases from other jurisdictions dealing with the term "developed" in the context of land confirm that "develop" connotes conversion into an area suitable for use or sale.[5] *See Kenai Peninsula Borough v. Cook Inlet Region, Inc.,* 807 P.2d 487, 496 (Alaska 1991) ("In the context of raw land, the common meaning of 'developed' includes subdivided property which is ready for sale." (footnote omitted)); *Winkelman v. City of Tiburon,* 32 Cal.App.3d 834, 843, 108 Cal.Rptr. 415 (Ct.App.1973) ("The term 'develop' connotes the act of converting a tract of land into an area suitable for residential or business uses."); *Prince George's Cnty. v. Equitable Trust Co.,* 44 Md.App. 272, 408 A.2d 737, 742 (1979) (defining the term "develop" as "the act of converting a tract of land into an area suitable for residential or business uses" (citing Webster's New Int'l Dictionary (2d

---

5. Respondents cite to a Greenville County ordinance as further proof that for a parcel of land to be subdivided into lots for purposes of development, there must be an intent to sell, lease, or build on the property. *See* Greenville County, S.C., Ordinance 4225 (Sept. 16, 2008) ("Subdivision means all divisions of a tract or parcel of land into two or more lots, building sites, or other divisions for the purpose, whether immediate or future, of sale, lease, or building development[ ... ]").

ed.1959))); *Muirhead v. Pilot Props., Inc.*, 258 So.2d 232, 233 (Miss.1972) (stating "[t]he term 'develop' has generally been interpreted when used in connection with real estate to mean the converting of a tract of land into an area suitable for residential or business uses"); *Sleasman v. City of Lacey*, 159 Wash.2d 639, 151 P.3d 990, 991 (2007) (finding an ordinance requiring a permit for tree removal on "undeveloped" or "partially developed" property did not apply to the home-owners' property because under the plain meaning of the ordinance, the property was "developed" as it was a lawful building site ready for sale or use); *B & W Constr., Inc. v. City of Lacey*, 19 Wash.App. 220, 577 P.2d 583, 586 (1978) (finding the platting of property on paper without further steps to develop it, such as adding sewers, streets, and utili-ties, was insufficient to show a lot was developed for purposes of establishing comparable value of property in an inverse condemnation case); *cf. Best Bldg. Co. v. Sikes*, 394 S.W.2d 57, 63 (Tex.App.1965) (approving the trial court's finding in a breach of contract action based in part on extrinsic evidence that the term "develop" would include the acts of subdividing a tract of land into lots, adding streets, and installing utilities).

Merriam–Webster's Dictionary defines "develop" in a land context as follows: "to convert (as raw land) into an area suitable for residential or business purposes <they [devel-op]ed several large tracts on the edge of town>; *also:* to alter raw land into (an area suitable for building) <the subdivisions that they [develop]ed were soon built up>." *See* Webster's Third New Int'l Dictionary 618 (3d ed.1986). Although the most recent edition of Black's Law Dictionary does not define the term "develop" or "developed," it states "improved land" [6] is "[l]and that has been developed; esp., land occupied by buildings and structures," whereas "unimproved land" is "[r]aw land that has never been developed, and usu[ally] that lacks utilities." Black's Law Dictionary 1008–09 (10th ed.2014). Based on its plain and ordinary meaning, we find the term "developed" requires affirmative acts on the part of

---

**6.** We are, however, aware that "developed" land is not always tanta-mount to "improved" land. *See Sleasman*, 151 P.3d at 993 (finding that after land is developed, it may then be improved by adding a structure to the land, and clarifying that "one cannot build or improve upon a lot unless it is developed").

the owner to transfer the property from raw land to a more improved state.

In light of these definitions, we look at the language contained within the 1981 R & Cs. The 1981 R & Cs specifically state that the document may be amended only "by a vote of a majority of the then owners of the lots into which the property ... shall have been developed...." In drafting the 1981 R & Cs, Lincoln specifically required the lot to be developed prior to possessing a right to change the 1981 R & Cs. Appellants set forth no evidence—whether it be roads, sewer lines, water, or electricity—that they instituted any improvements on the Property in the thirty years of their ownership as contemplated by the 1981 R & Cs. We recognize Appellants possessed an easement for sewer, drainage, and utilities over the Property, but an easement, in and of itself, is not tantamount to an improvement. Further, while Appellants claim the unrecorded plat dividing the Property into five smaller lots proves the lots were developed, we find this evidence is not conclusive on whether J.B. Stephens intended to develop and sell these five lots because the plat was never recorded. *See Sleasman,* 151 P.3d at 992–93 (finding "the most obvious example of 'development' is the platting process where building lots are made ready for sale or use for future improvement"). Moreover, Lincoln chose the past tense when it included the language "have been developed," as opposed to "may be developed" or "will be developed." *See generally Mathis v. Brown & Brown of S.C., Inc.,* 389 S.C. 299, 318, 698 S.E.2d 773, 783 (2010) (finding choice of the past tense of the verbs "rendered" and "recompensed" in a statutory scheme as evidence the acts were to have occurred in the past as opposed to prospectively). We cannot imply language into the 1981 R & Cs that is not written, even if a different interpretation would be more favorable in the present day. *See S.C. Dep't of Natural Res. v. Town of McClellanville,* 345 S.C. 617, 622, 550 S.E.2d 299, 302 (2001) ("The court may not limit a restriction in a deed, nor, on the other hand, will a restriction be enlarged or extended by construction or implication beyond the clear meaning of its terms even to accomplish what it may be thought the parties would have desired had a situation which later developed been foreseen by them at the time when the restriction was written." (emphasis omitted)). Even if Appel-

lants took some prefatory steps to develop the Property into five lots, under the plain meaning of the term, we find Appellants failed to develop the lots prior to amending the 1981 R & Cs. Thus, we affirm the circuit court's finding on this issue.[7]

## II. Reliance upon State and Local Law

▮▮▮ Next, Appellants claim the circuit court and Respondents improperly cite to Section 30–5–240 of the South Carolina Code (2007) and a Greenville County ordinance for the proposition that a sale pursuant to an unrecorded plat is void or voidable. We address each argument in turn.

Section 30–5–240 states,

When real property is subdivided for the purpose of sale and is sold or offered for sale according to a plat of a survey thereof, the person first offering such property for sale *shall* file a plat or blueprint of such survey in the office of the clerk of court of the county in which such real estate is situate[d]. In the event that the owner fails to comply with the above provision he shall become liable to the purchaser or to any subsequent grantee of the land, or of any portion thereof, in such sum as shall be found necessary to procure and record such plat.

(emphasis added).

The relevant portion of the Greenville County ordinance states,

The owner ... of any land ... who transfers, sells, or agrees to sell such land by reference to, or exhibition of, or by other use of a plat or subdivision of such land before such plat has been approved by the Planning Commission and recorded in the office of the County Register of Deeds shall forfeit and pay a penalty of $100 for each lot so transferred, sold, or agreed or negotiated to be sold.

---

7. Because we find the language of the 1981 R & Cs regarding developed lots is unambiguous, we decline to consider extrinsic evidence submitted by Appellants in support of their argument that the lots were developed. *See McClellanville,* 345 S.C. at 623, 550 S.E.2d at 303 (holding that a court will not examine extrinsic evidence to interpret a contract absent an ambiguity).

Greenville County, S.C., Ordinance 3870, § 1.3 (Dec. 13, 2004). Appellants submitted no proof that either Appellants or any predecessor in interest ever submitted a plat, received approval for a plat, or recorded a plat as contemplated and required by law.[8]

We find the failure to fulfill the requirements enunciated in the foregoing state and local law are evidence that J.B. Stephens did not intend to subdivide the Property for development purposes when the plat was initially prepared. Further, although Appellants' failure to abide by these rules of law would not necessarily invalidate a subsequent sale, we find it would be inequitable to permit Appellants to use an unrecorded plat as evidence that the lots were subdivided and intended for sale if the ordinance and statute require recordation as a prerequisite to sale. *See Buffington,* 383 S.C. at 393, 680 S.E.2d at 291 ("[W]hile there is no formulaic balancing test, ... this [c]ourt has consistently held that courts should consider equitable doctrines when determining whether to enforce a restrictive covenant and enjoin a landowner from using their land in a manner that violates the covenant."). Based on the foregoing, we find the circuit court did not err in relying upon section 30–5–240 and a Greenville County ordinance as support for its conclusion that the Property was not developed into lots as contemplated by the 1981 R & Cs.

### III. Text of the 1981 R & Cs and the Drafter's Intent

Last, Appellants contend the circuit court failed to consider the text of the 1981 R & Cs as well as the drafter's intentions when it concluded the Property was not developed into lots. We disagree.

Appellants first claim another provision within the 1981 R & Cs confirms that the lots in question were developed. Appellants cite to a sentence within the 1981 R & Cs that permits the restrictions to be enforced against "any property owner of any lot into which the property described

---

8. Appellants cite to the Greenville County tax map sheet, which reflects the Property is demarcated into five smaller lots, as evidence that the plat was at some point submitted to the authorities. However, the circuit court never noted this evidence in its order, and Appellants failed to submit further proof that the plat was submitted to the Greenville County Planning Commission for approval.

above shall subsequently be *cut.*" (emphasis added). Appellants essentially argue that a "lot" is merely property which has been "cut" from a larger parcel of land. Assuming this to be true, this reference does not require us to find the Property was developed into five lots. This provision pertains to an owner's ability to enforce the restrictive covenants against any other owner who violates the 1981 R & Cs. We find it reasonable to conclude that any owner could bring an action to enforce the 1981 R & Cs against any other owner, regardless of how many lots the owner in violation of the 1981 R & Cs possesses.

On the other hand, Lincoln specifically required the lots to be developed before an owner could vote to amend or modify the 1981 R & Cs. Further, we note that in the amendment provision within the 1981 R & Cs, Lincoln chose to afford each homeowner within Watson's Orchard Subdivision a vote based on residency within the subdivision. However, for the owners in possession of property outside the subdivision, their voting rights were not based merely on owning a "lot," but on owning a "developed lot." We find it reasonable to conclude that homeowners within the subdivision and property owners who expended financial resources to develop their lots would be most affected by any changes to the 1981 R & Cs and, thus, would be afforded the greatest voting rights.

 Next, Appellants claim the circuit court ignored the testimony of Patrick Grayson, the attorney who drafted the 1981 R & Cs, regarding the meaning of "developed lots." Because the language in the 1981 R & Cs was unambiguous, we find the circuit court did not need to consider extrinsic evidence—by way of testimony or otherwise—regarding the meaning of this term. *See McClellanville,* 345 S.C. at 623, 550 S.E.2d at 303 (holding that a court will not examine extrinsic evidence to interpret a contract absent an ambiguity).

## CONCLUSION

Based on the foregoing, the circuit court's decision is **AFFIRMED.**

GEATHERS and McDONALD, JJ., concur.